**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**

CEDRA PHARMACY HOUSTON LLC, JAMMZ
CHEMISTS LLC d/b/a CEDRA DALLAS, and
CEDRA PHARMACY LOS ANGELES LLC,

*Plaintiffs*,

- against –

UNITEDHEALTH GROUP INC., UNITED
HEALTHCARE SERVICES, INC., OPTUMRX,
INC., CATAMARAN CORPORATION,
CATAMARAN PBM OF ILLINOIS, INC.,
CATAMARAN LLC, BRIOVARX OF MAINE,
INC., BRIOVARX, LLC, and SALVEO SPECIALTY
PHARMACY, INC.,

*Defendants*.

**JURY TRIAL DEMANDED**

Civil Action No. 4:17-cv-3800

**COMPLAINT**

The plaintiffs, Cedra Pharmacy Houston LLC ("Cedra Houston"), JAMMZ Chemists

LLC d/b/a Cedra Dallas ("Cedra Dallas"), and Cedra Pharmacy Los Angeles LLC ("Cedra LA")

(hereinafter collectively referred to as "Plaintiffs") by and through their attorneys, Sauchik &

Giyaur, P.C., as and for their Complaint against the defendants, UnitedHealth Group Inc.

("UnitedHealth Group"), OptumRx, Inc. ("ORX"), United Healthcare Services, Inc. ("UHC"),

Catamaran Corp., Catamaran PBM of Illinois, Inc., Catamaran LLC, (hereinafter collectively

referred to as "Catamaran"), BriovaRx of Maine, Inc., BriovaRx, LLC, (hereinafter collectively

referred to as "Briova") and Salveo Specialty Pharmacy, Inc. ("Salveo") (hereinafter collectively

referred to as "Defendants"), allege upon personal knowledge, information and belief, and due

investigation, the following:

- 1 -

## INTRODUCTION

1.      This action arises out of a pattern of economic extortion and anti-competitive conduct by Defendants—a cabal of some of the most powerful healthcare companies—that conspired to eliminate competition by Plaintiffs – three independent pharmacies.  The object of the conspiracy was to grab the ever-increasing share of the most lucrative segment of the pharmacy business; namely, specialty pharmacy.

2.      The illegalities alleged here are not just isolated instances of malfeasance perpetrated upon Plaintiffs, but part of a larger pattern – a concerted effort to squeeze out smaller independent pharmacies from a profitable and growing marketplace.

3.      Defendants treat the pharmacy services industry and its consumers as a territory that is theirs to control – and enforce their control through threats of economic devastation to any independent pharmacy attempting to challenge Defendants' hegemony.

4.      Defendants control the flow of healthcare dollars by managing a network of pharmacies that service members of Defendants' health plan sponsors.  These pharmacy networks are, by law, required to provide patients with a choice of pharmacy providers.  Instead, Defendants use the network to extort and eliminate independent pharmacies, including Plaintiffs, and steer business towards their own in-house pharmacies.

5.      These tactics lead to spectacular enrichment by the entities that profess to be the stewards of the financial integrity of our healthcare delivery system.  All this is done under a guise of achieving "efficiencies" in the marketplace.

6.      Having achieved market domination, Defendants withhold or terminate access to their networks from independent pharmacies that dispense lucrative specialty medications and

- 2 -

eagerly grab the profits that independent pharmacies forgo as a result.  What access Defendants do grant to independent pharmacies comes with a thinly-veiled warning: *know your place*.

7.      Plaintiffs are community pharmacies based out of Texas and California that are just some of the victims of Defendants' concerted efforts to dominate the specialty pharmacy market.

8.      Defendants include pharmacy benefit managers ("PBMs") that act as administrators of prescription drug coverage for health insurance plans, such as Cigna, Wellcare and UnitedHealthcare.  Most insurance plans contract exclusively with one PBM to process prescription claims for its members.  On behalf of their health insurer sponsors, PBMs process prescription drug claims submitted for reimbursement by pharmacies. One PBM typically serves as a PBM for multiple insurance plans.  To be able to service patients who have a particular health insurance plan, a pharmacy must enter into an agreement with a specific PBM to participate in its network.  Collectively, three PBMs in the United States – Catamaran/OptumRx, CVS Caremark and Express Scripts - control the overwhelming share of the prescription benefit management market.

9.       Previously, the Catamaran Defendants and ORX were separate PBMs.  In 2015, Defendant UnitedHealth Group, the parent company of ORX, acquired Catamaran, united the two companies, and created the third-largest PBM in the United States – Catamaran/OptumRx. Patients whose claims must be processed by the Defendants typically comprise about thirty to forty percent of a retail pharmacy's business.

10.      Following the merger between Catamaran and ORX, access to their networks is even more critical for a typical retail pharmacy.  Indeed, no retail pharmacy in Texas or

- 3 -

California can be economically viable without access to the combined Catamaran/OptumRx network.

11.     Defendants now maintain dominant economic control over independent pharmacies since their decision to withhold—or terminate—a pharmacy's access to their networks almost invariably pushes a pharmacy into insolvency.

12.     Defendants, remarkably, are not merely content with enjoying their dominant position in the PBM market.  They wrongfully exploit their control over access to their networks to get an ever-increasing foothold on the most rapidly expanding segment of the larger healthcare market: dispensing specialty medications.

13.     Specialty medications are high-priced drugs used to treat complicated and difficult to manage conditions such as Hepatitis C, rheumatoid arthritis, and the like.  The specialty medications market is currently valued at $100 billion and projected to increase to $400 billion by 2020.

14.     Even pre-merger, the Defendant PBMs owned large in-house mail-order specialty pharmacies, such as Defendant Briova, and were rapidly expanding their presence in the specialty market.  For instance, in 2015 Catamaran acquired Defendant Salveo, one of the largest specialty pharmacies.  This helped Catamaran to increase their revenues in the first quarter of 2015 by over twenty percent compared to the same period in 2014.  Defendants have repeatedly stated that one, if not *the* primary, reason for the combination of Catamaran and ORX was to capture a larger share of the specialty drug market.

15.     PBM-owned pharmacies enjoy additional advantages, such as complete access to the PBM's patients' data and claim records, and are able to better solicit patients and their physicians for specialty pharmacy business – and they do so incessantly.

- 4 -

16.     The unmistakable conflict of interest illustrated here has created a strong incentive for Defendants to merge for the purpose of injuring, harming, and eliminating independent pharmacies such as Plaintiffs.  Not satisfied with the growth of their patient base through the means outlined above, Defendants seek complete sway over the specialty pharmacy market.  To achieve this, they have conspired to engage in blatantly anti-competitive conduct in an effort to grab as much specialty medication-related revenue as quickly as possible.

17.     When confronted with certain rights and protections afforded under Federal and state laws to independent pharmacies, Defendants have engaged in a pattern of extortion in an effort to coerce Plaintiffs into forgoing their statutory and common law rights.

18.     Defendants target independent pharmacies because, while PBM-owned specialty pharmacies already dominate the market, the amount of specialty drug revenue under independent pharmacy control is still significant.

19.     Moreover, Plaintiffs are now seeking to further expand into this business, through multiple pharmacies, in these same geographical areas. This is more competition that Defendants can bear, and a large piece of the pie that Defendants want to claim to themselves.  Through the tactics and acts outlined below, Defendants conspired to use their economic control over community pharmacies to extort and Plaintiffs and other similarly situated independent pharmacies as competition in the specialty drug market.

## JURISDICTION AND VENUE

20.     This Court has federal question subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, predicated on Plaintiffs' claims under the Sherman Act and Clayton Act, particularly 15 U.S.C. § 22, which specifically confers jurisdiction over actions brought pursuant to the Sherman Act, and further, personal jurisdiction, in that some or all of the

S&G/685/40/0049237

acts proscribed by 15 U.S.C. §§ 1 and 2, as alleged herein occurred in the Southern District of Texas, and further, Defendants transact business in this District as set forth below.

21.     Alternatively, this Court has federal question jurisdiction over this action pursuant to 28 U.S.C. § 1331, predicated on Plaintiffs' claims under the Racketeer Influenced and Corrupt Organizations ("RICO") Act, particularly 18 U.S.C. § 1964(c), which specifically confers jurisdiction over actions brought pursuant to the RICO Act, and further, personal jurisdiction, in that some or all of the acts proscribed by 18 U.S.C. § 1962, as alleged herein occurred in the Southern District of Texas, and further, Defendants transact business in this District as set forth below.

22.     In addition, this Court has jurisdiction pursuant to the principles of supplemental jurisdiction under 28 U.S.C. § 1367.

23.     Venue is proper in the Southern District of Texas pursuant to 28 U.S.C. § 1391 and 15 U.S.C. § 22 because Defendants are found, transacts business, and committed the acts alleged herein and proscribed by 15 U.S.C. § 1 and 2 and 18 U.S.C. § 1962, in this District.

24.     Plaintiffs bring this joinder action pursuant to Rule 20 of the Federal Rules of Civil Procedure, because their claims arise out of the same series of transactions and occurrences, and share common questions of law and fact.

## THE PARTIES

25.     Plaintiff Cedra Houston is a limited liability company organized under the laws of the State of Texas, with its principal place of business at 1607 South Post Oak Lane, Houston, Texas 77056.

- 6 -

26.     Plaintiff Cedra Dallas is a limited liability company organized under the laws of the State of Texas, with its principal place of business at 9669 North Central Expressway, Suite 190, Dallas, Texas 75231.

27.     Plaintiff Cedra LA is a limited liability company organized under the laws of the State of Delaware, with its principal place of business at 1417 West Beverly Boulevard, Suite 103, Montebello, California 90640.

28.     Defendant UnitedHealth Group is a corporation organized under the laws of the State of Delaware with its principal place of business at 9900 Bren Road East, Minnetonka, Minnesota 55343.  Defendant UnitedHealth is a health care company operating, amongst other things, two distinct, but strategically aligned, lines of business: providing health benefits, operating under Defendant UHC, and pharmacy benefit management, operating under Defendants ORX and Catamaran.

29.     Defendant UHC is a corporation organized under the laws of the State of Minnesota with its principal place of business at 9900 Bren Road East, Minnetonka, Minnesota 55343.  Defendant UHC is a wholly-owned subsidiary of Defendant UnitedHealth Group.

30.     Defendant ORX is a corporation organized under the laws of the State of California with its principal place of business at 2300 Main Street MS CA134-0501, Irvine, California 92614.  Defendant ORX is a wholly-owned subsidiary of Defendant UnitedHealth Group, and is described as UnitedHealth Group's free-standing pharmacy care services business.

31.     The Catamaran Defendants consist of:

- Catamaran Corporation, a corporation organized under the laws of the Yukon Territory, with its principal place of business at 1600 McConnor Parkway, Schaumburg, Illinois 60173-6801;

S&G/685/40/0049237

- Catamaran PBM of Illinois, Inc., a corporation organized under the laws of the State of Delaware, with its principal place of business at 1600 McConnor Parkway, Schaumburg, Illinois 60173-6801;

- Catamaran LLC, a limited liability company organized under the laws of the State of Texas, with its principal place of business at 1600 McConnor Parkway, Schaumburg, Illinois 60173-6801;

- The Catamaran Defendants, prior to a July 2015 merger with ORX, operated as an independent pharmacy benefit manager.  Following the Catamaran/ORX merger, Catamaran has merged most of its operations with ORX, but continues to maintain some legacy networks.

32.     The Briova Defendants consist of:

- BriovaRx of Maine, Inc., a corporation organized under the laws of the State of Maine with its principal place of business 53 Darling Avenue, S Portland, Maine, 04106-2301;

- BriovaRx, LLC, a limited liability company organized under the laws of the State of Alabama with its principal place of business located at 1600 McConnor Parkway, Schaumburg, IL 60173-6801.  Its sole member is BriovaRx of Maine, Inc.;

- Defendant Briova was Defendant Catamaran's in-house specialty pharmacy, and following the ORX-Catamaran merger, serves the same purpose for the merged PBM.

33.     Defendant Salveo is a corporation organized under the laws of the State of Delaware with a principal place of business at 1600 McConnor Parkway, Schaumburg, Illinois

S&G/685/40/0049237

60173.  Defendant Salveo was acquired by Defendant Catamaran in 2015, and following the

ORX-Catamaran merger, was merged with Defendant Briova.

## FACTS COMMON TO ALL CAUSES OF ACTION

### Pharmacy Benefit Managers

34.     Pharmacy benefit managers ("PBMs") are third-party administrators contracted

by health plans, employers, unions, and government entities to manage prescription drug

programs on behalf of health plan beneficiaries.   Defendants ORX and Catamaran act as

administrators of prescription drug coverage for health insurance plans such as Cigna, Wellcare

and UnitedHealthcare, among others.

35.     Most insurance plans have one exclusive PBM that processes prescription claims

for its members.  For instance, ORX is exclusively affiliated with the number one health insurer

in the United States – Defendant UHC.  PBMs typically, but not always, have multiple insurance

plan sponsors.

36.     For retail pharmacies, no relationship is more critical than their contractual

agreements with PBMs.  Indeed, just three PBMs have near-unrestrained control over the retail

pharmacy industry, with the power to make unilateral decisions that can financially ruin a

pharmacy.

37.     Crucially, to be able to service patients insured through a particular health

insurance plan, a pharmacy must enter into a network participation agreement with that insurer's

corresponding PBM.

38.     A network participation agreement allows a pharmacy entry into a "network" that consists of many pharmacies that service the members of an insurance plan. PBMs then manage, operate and control the network on behalf of the plan sponsor.

39.     Collectively, the three largest PBMs in the United States—ORX, CVS Caremark and Express Scripts—control the overwhelming majority of the market. ORX's status as one of the "Big Three" is a direct result of a merger that goes to the heart of the conspiracy alleged by Plaintiffs: that Defendants engaged blatantly anti-competitive conduct as well as a pattern of racketeering activity through their network(s).

40.     Prior to 2015, ORX enjoyed a lesser—but still significant— portion of the prescription drug coverage market, approximately 13%. Early in 2014, Defendant UnitedHealth Group, the parent company of Defendant ORX, began exploring the acquisition ORX's fellow PBM – Defendant Catamaran. At the time, Catamaran controlled 9% of the prescription drug coverage market.

41.     In or about July 2015, UnitedHealth Group acquired Defendant Catamaran. Catamaran and ORX then merged, creating one of the three largest PBMs in the United States.

42.     Post-merger, ORX operates as the primary PBM brand, although the Catamaran brand remained active for some time following the merger, and operates legacy networks. The Catamaran/ORX operation controls and processes over one billion prescription claims for approximately 65 million Americans, accounting for 22% of all prescription claims nationwide. Defendants, as such, had now achieved dominant economic control over each independent pharmacy, since their decisions regarding the network status of a pharmacy, *i.e.* to deny a pharmacy entry into their network, or terminate a pharmacy from their network, can significantly

S&G/685/40/0049237

impede and burden a pharmacy's operations, to the point where its long-term survival is extremely doubtful.

43.     Prior to the merger between Catamaran and ORX, a typical retail pharmacy could usually remain in business even without access and admission into either the Catamaran or ORX networks.

44.     Today, a typical pharmacy in urban locations such as Houston, Dallas, or Los Angeles, such as each of the Plaintiffs, does not have a meaningful choice whether to forgo participating with ORX/Catamaran's networks.  To be economically viable, it must participate with them, as well as the other two PBMs making up the "Big Three".  The pharmacy's goodwill and financial standing depends, for the most part, on its status as a participant in all major PBM networks.

45.      Defendants therefore maintain dominant economic control over every community pharmacy in Plaintiffs' geographical area.  No independent pharmacy can survive in the highly-competitive marketplace without participating with Defendants.

**The Specialty Pharmacy Business**

46.     The PBM business, standing alone, is one of the most lucrative industries in the United States.  Following the Catamaran/ORX merger, Defendants enjoy a dominant position in the PBM market.  Nonetheless, for Defendants, this prosperity is not enough.

47.     Instead, Defendants have aggressively moved to become pharmacy providers themselves.  In particular, Defendants have focused on the most lucrative segment of the pharmacy market – the specialty pharmacy business.

48.     The term "specialty drugs" colloquially refers to medications that are complicated to make, require special storage and/or administration, and target life-threatening diseases that do

- 11 -

not respond to other therapies.  They are used to treat complex, chronic and extremely costly conditions.  Specialty drugs include those that treat conditions such as Hepatitis C, HIV, multiple sclerosis, rheumatoid arthritis, and hemophilia, amongst others.

49.    "Specialty pharmacies" frequently dispense specialty drugs.  However, specialty pharmacies are not by any means the exclusive purveyor of these prescriptions.  Regular retail pharmacies are permitted to, and indeed frequently do, dispense such prescriptions. Currently, these drugs—and specifically Hepatitis C drugs—are one of the largest sources of revenue growth for any pharmacy that can manage entry into, and remain in, this line of business.

50.    The opportunity for these vast revenues neatly explains Defendants' aggressive and urgent move into the specialty drug market.  The specialty medication market size, at current estimation, is $100 billion.  Expected growth is predicted to reach $400 billion in 2020. Owning their own specialty pharmacies allows the PBMs to capture the margins on high-cost drugs, which can be very significant, and can reach thousands of dollars per prescription.

51.    Catamaran and ORX, pre-merger, operated mail-order specialty pharmacies. ORX operated an in-house specialty pharmacy, and Catamaran owned Defendant Briova.  In 2014, ORX's in-house specialty pharmacy operator was the fourth largest in the United States, and Defendant Briova was the sixth largest specialty pharmacy in the Unites States.

52.    Defendants also aggressively extended their grip on the specialty pharmacy business through acquisitions and other means, particularly in the New York, Texas and California markets – the three largest markets for filling prescription drugs.  Upon information and belief, these acquisitions and transactions were also undertaken in furtherance of Defendants' conspiracy to dominate the specialty drug market.

- 12 -

53.     In late 2011, Catamaran acquired SaveDirectRx, a Texas-based specialty pharmacy in San Antonio, Texas.  In early 2015, Catamaran acquired the largest specialty pharmacy chain operating in New York and California, Defendant Salveo, with an estimated $400 million in revenues.  This move helped Catamaran to increase its revenue in the first quarter of 2015 by over twenty percent compared with the same quarter in 2014.

54.     Following the Catamaran/ORX merger, all of these specialty pharmacies began largely operating under the Briova banner and Defendants began migrating all their specialty pharmacy business to Briova.

55.     The PBM domination of the specialty pharmacy market has had negative consequences for consumers, which also highlight the important role of independent community pharmacies in the specialty drug market, as providers of vital, personal service to their patients.

56.     The PBM-owned pharmacies, as mail order pharmacies, are usually not located in the communities they serve.  These pharmacies, once receiving the prescriptions, fill and mail the medication to the patients.   There is little or no personal interaction between the pharmacy and the patient, or the pharmacy and the prescribing provider.  Indeed, it can be very difficult for patients—who are often taking complex drugs with significant side effects—to contact the filling pharmacist at a mail-order pharmacy.  Also, PBM mail-order pharmacies sometimes take days or even weeks to mail the drugs to patients.

57.     In contrast, patients will almost always receive their drugs sooner from independent community pharmacies, typically within twenty-four hours.  Community pharmacies also typically offer free delivery and personal attention of the pharmacy' staff.  Most importantly, community pharmacies provide personal knowledge of both the patient and the prescribing provider, which contributes significantly to patient outcomes.

58.     Moreover, at least in theory, PBM-owned or affiliated specialty pharmacies are supposed to operate on equal footing with independent pharmacies.  As such, even though an independent pharmacy may be competing with a PBM-owned specialty pharmacy for consumers whose pharmacy benefits are administered by the specialty pharmacy's affiliated PBM, the PBM-owned pharmacy should not enjoy any special advantage as a result over the independent pharmacy.

59.     Yet, only a small number of independent pharmacies can enter the specialty drug market.  This is for several reasons:

- *First*, the acquisition cost of specialty medications is extremely high.  For instance, the invoice price for an independent pharmacy of a typical 28-day supply of a common Hepatitis C medication, Harvoni, is about $30,000.

- *Second*, PBMs and their respective sponsor insurance plans, at best impose onerous conditions upon the pharmacy's ability to process claims for such medications; at worst, many PBMs simply refuse to allow independent pharmacies to fill specialty drugs for many commercial plans.  The only exception is Medicare Part D plans, because Federal law mandates that plan sponsors allow pharmacies to fill specialty drugs.

- *Third*, PBM-owned pharmacies, using their dominant market power, frequently enter into agreements with manufacturers for access to and rebates on certain limited distribution drugs, to which smaller independent pharmacies do not have access.

60.     Additionally, the supposedly equal playing field notwithstanding, PBMs, such as Defendants, and their sponsor insurance plans, such as Defendants UnitedHealth Group/UHC,

aggressively steer patients towards PBM-owned pharmacies, particularly in the specialty pharmacy segment.

61.     For example, many insurance plans simply do not list independent specialty pharmacies in their customer manuals or on their websites. The availability of PBM-owned mail-order pharmacies, by contrast, is widely emphasized.  For uncommitted patients seeking an independent pharmacy that deals with specialty medications, the PBM-owned mail-order specialty pharmacy thus becomes the default option.

62.     Moreover, PBM pharmacies enjoy access to the patients' data and claim records and are able to better solicit these patients and their physicians for specialty business – and do so incessantly.

63.     However, even when facing all these challenges, dispensing specialty drugs can be a sound source of income for a business-savvy independent pharmacy that has access to adequate financing and can offer excellent personal care to each patient.

**The Cedra Owners' Efforts to Gain Access to the ORX/Catamaran Network**

64.     Plaintiffs' principals are an example of savvy ownership and prudent management that is an illustration of how an independent pharmacy can succeed in the specialty pharmacy marketplace.

65.     Cedra Houston, Cedra Dallas and Cedra LA are owned by the same individuals: Mazen Karnaby, Ziad Karnaby, Andrew Melisi, and Nahil Abou Trad (herein after collectively referred to as the "Cedra Owners").

66.     The Cedra Owners are responsible for creating the innovative "Cedra" brand: a group of separately incorporated pharmacies which share common ownership, strategic outlook, and creative vision.

- 15 -

67.     Previously, the Cedra Owners confined their operations to the East Coast, primarily in and around New York City.

68.     In or around 2013, the Cedra Owners began operating Cedra Pharmacy, Inc. located in the Bronx borough of New York City ("Cedra Bronx").

69.     In or around 2014, the Cedra Owners began operating MMAZ Chemists Inc. dba Cedra NYC Pharmacy, located in the Manhattan borough of New York City ("Cedra NYC").

70.     In or about 2016, Defendants began operating a second Manhattan location, Cedra Pharmacy Broadway LLC.

71.     Additionally, the Cedra Owners, to varying extents, were involved in other, non-Cedra branded pharmacies.

72.     The quality of services and not-commonly available drugs offered by the pharmacies operated by the Cedra Owners enabled the pharmacies to see significant growth.

73.     In particular, Cedra Bronx earned a great reputation among its customers and professional peers, including prescribing physicians, and earned a number of accreditations.

74.     For example, Cedra Bronx earned the prestigious specialty pharmacy accreditation offered by URAC, an independent, non-profit organization that is widely considered to be the gold standard for accrediting organizations involved in medical/pharmacy care services.  Earning URAC accreditation is an arduous process and does not come easily.  The review process considers the entire scope of a pharmacy's operations.  Of the thousands of pharmacies located in New York State, only thirty-four specialty pharmacies currently have URAC accreditation.

- 16 -

75.     Cedra Bronx also earned specialty pharmacy accreditation from another leading accrediting organization, Accreditation Commission for Health Care ("ACHC").  Only twenty-nine pharmacies in New York State currently have ACHC specialty pharmacy accreditation.

76.     Cedra Bronx, in 2014, decided to build on its unique New York business, and expand operations out of state, eventually obtaining licensure in approximately thirty states.  As a rule, pharmacies must be licensed in the state that they are located in.  However, pharmacies can seek "non-resident" licensure from additional states, which would allow them to fill prescriptions in those non-resident states.

77.     In or about 2014, Cedra Bronx sought, and received, non-resident licensure from the State of Texas, allowing it to fill prescriptions for Texas residents.

78.     Through its commitment to quality service and an effective sales and marketing team, Cedra Bronx was then able to replicate its New York success in the Texas market.  Cedra Bronx became much sought after by knowledgeable Texas consumers of the specialty drug market.  Prescribing providers, too, increasingly referred patients without an existing specialty pharmacy of choice to Cedra Bronx.  By 2015, Cedra Bronx was doing over $20 million in business filling prescriptions for various specialty drugs in Texas.

**Defendants Conspiracy to Eliminate Competition from the Specialty Pharmacy Market**

79.     Prior to the completion of the ORX/Catamaran merger, Defendants UnitedHealth Group, ORX, Catamaran, Briova and (prior to their acquisition by Catamaran) Salveo would meet regularly to discuss potential business "synergies."  Upon information and belief, as part of these "synergy" discussions, Defendants conspired to act in concert to eliminate competition by independent pharmacies from the specialty drug market, through any means possible – whether or not lawful.

- 17 -

80.     In January of 2014, Defendants UnitedHealth Group, ORX and Catamaran began meeting in earnest, and on a regular basis, to discuss the possibility of merging; while these discussions were ongoing, Defendant Salveo and Defendants Catamaran/Briova would begin discussing a merger as well.

81.     Upon information and belief, these merger discussions were part of a larger conspiracy to restrain and destroy competition for specialty drugs, allowing Defendants to capture additional volume in an incredibly lucrative source of revenue.

82.     Defendants have frequently and publicly made clear the importance of their specialty pharmacy business in relation to the unlawful merger of Catamaran and ORX.  In the press release announcing the merger, Defendants specifically cited the "rapidly growing specialty pharmacy services" that both Defendants ORX and Catamaran offered as a prime reason for the merger.

83.     On another occasion, when announcing the deal to Catamaran employees, Defendants' executives stated that "both of our companies have strong specialty pharmacy businesses.  Specialty pharmacy is expected to grow by 300 percent over the next five years, from $100 billion in revenues to potentially $400 billion annually by 2020."

84.     Moreover, during the Catamaran/ORX merger discussions, Catamaran, Briova and Salveo held discussions about merging their businesses.  In November of 2014, Defendant Catamaran announced their intent to acquire Defendant Salveo.  The transaction closed in February 2015.  When announcing the acquisition, Mark Thierer, then-Chairman and CEO of Catamaran, stated that "Salveo and BriovaRx are highly complementary to each other and the combination presents a great opportunity to further expand our specialty scale."

85.     Upon information and belief, Catamaran's acquisition of Salveo was also motivated by a desire to increase its market share, and then use that market share to eliminate competition upon merging with ORX.

86.     Defendants engaged in other transactions aimed at growing their specialty pharmacy business.  Texas, New York and California, as the three largest markets for filling prescription drugs, were particularly important targets for market domination in the lead-up to the Catamaran/ORX merger.

87.     As of March 2014, Catamaran operated mail pharmacy facilities in three states – one of which was Texas.  It also maintained specialty pharmacy operations in Texas.  In or about October 2011, Catamaran acquired tPTRX, Inc. ("PTRX"), a full-service PBM, and its exclusive mail-order pharmacy provider, SaveDirectRx, Inc., both based in San Antonio, Texas, for the stated purpose of allowing Catamaran to "extend its presence in the southwestern part of the U.S."

88.     The purchase of Salveo was also a significant move by Catamaran into the New York and California markets.   Indeed, according to Catamaran's executives, the motivation behind the purchase was Salveo "providing a local market presence on the East and the West Coast", as well as Salveo's "core focus" on Hepatitis C drugs.

89.     Additionally, upon information and belief, Defendants planned to grow Salveo's already-significant Hepatitis C business by eliminating any independent pharmacy competition.

90.     The Defendants' securities filings also emphasized the importance of the specialty pharmacy business and the enormous revenue it generated.  In a 10Q filed with the Securities and Exchange Commission, Catamaran noted that by March 31, 2015, revenue increased by $1.1 billion, or 21.7%, to $6.0 billion for the three months ending March 31, 2015, as compared to

S&G/685/40/0049237

$4.9 billion for the three months ending March 31, 2014.  Catamaran cited the prime reasons for this growth as being the "expansion of our specialty book of business, as well as the addition of the Salveo specialty business." Additionally, Defendants noted that their increased specialty claim volume—as opposed to regular prescription claims—increases their overall revenue per prescription claim due to specialty claims carrying a higher revenue per prescription claim rate.

91.     Upon information and belief, Defendants had decided that a merger first combining their specialty pharmacy operations, and then a merger combining their PBM operations and rendering themselves indispensable to independent pharmacies, would be the best method for serving the goal of eliminating independent pharmacy competition in the specialty drug market.  As such, all of the mergers, including the Catamaran/ORX merger which was completed in July 2015, were an unlawful conspiracy to restrain and destroy competition.

92.     Due to their desire for hegemony over the specialty drug market, Defendants, upon information and belief, agreed and conspired, as part of their merger, to initiate a targeted campaign to restrain trade in the specialty drug market.

93.     Defendants, as part of a related conspiracy, agreed to use inherently unlawful means to eliminate competition in the specialty drug market, including Plaintiffs, by operating their participating pharmacy network through a pattern of racketeering, including economically threatening and extorting Plaintiffs.

94.     For the conspirator Defendants, the Texas specialty pharmacy business maintained by Cedra Bronx—valued at more than $20 million—naturally represented an enticing target.  Moreover, Cedra Bronx had an additional $80 million worth of pharmacy business in other markets that Defendants sought to dominate, such as New York.

- 20 -

95.     Accordingly, prior to, during, and following all the above-referenced mergers, Catamaran, ORX and the other Defendants began their separate, but coordinated efforts to dominate and control the specialty pharmacy market.

96.     These efforts would lead Defendants to unlawfully operate and manage at least two enterprises.

97.     At first, Defendants focused on the New York and Texas markets, and then the California market.  As part of these efforts, in furtherance of the conspiracy, Defendants sought to eliminate and/or restrain the expansion of Cedra-branded or affiliated pharmacies, through any means available.

### *Defendant ORX's Pretextual Audit of Cedra Bronx*

98.     In March 2015, as the merger discussions were ongoing, Defendant ORX conducted an audit of Cedra Bronx, then and now an ORX-enrolled pharmacy.  PBMs, in their role as network administrators, conduct audits of claims reimbursed on behalf of the sponsor insurance plan.  Defendants have used these audits as a thinly-veiled means to harass and eliminate competitor pharmacies.

99.     The primary focus of ORX's March 2015 audit was Cedra Bronx's Texas-based business.  ORX's audit team, in particular, aimed attention at the specialty drugs prescriptions filled by Cedra Bronx via mail to Texas patients.  ORX claimed that Cedra Bronx was prohibited from filling out-of-state prescriptions by mail.

100.     Nothing in Texas law prohibits an out-of-state pharmacy from filling prescriptions in Texas, so long as they are licensed in Texas.  Cedra Bronx, at all relevant times, was and is licensed in Texas.  Moreover, there is nothing inherently unsafe about shipping prescriptions.  Indeed, pharmacies routinely ship prescriptions within their home state without any objections

being raised.  Notably, PBM-owned mail order pharmacies ship tremendous quantities of prescriptions out-of-state.

101.    The sole basis for ORX's contention that Cedra Bronx was prohibited from shipping prescriptions from New York into Texas was that the agreement of the parties purportedly prohibited it.  However, at the time—early in 2015—the issue of whether an ORX-enrolled pharmacy could ship to out-of-state patients was far from settled.

102.    In 2014, the Pharmacy Provider Manual issued by ORX did not meaningfully distinguish between mail order and non-mail order claims.

103.    In 2015, ORX, intent on dominating the mail-order/specialty pharmacy market, issued a revised pharmacy provider manual that for the first time drew significant differences between mail-order and non-mail order claims.  At the time of the March 2015 audit, and even earlier when Cedra Bronx had actually shipped the prescriptions, this change was recent and not well-known.  Indeed, in October 2015, ORX had to issue a bulletin clarifying and reminded pharmacies that filling mail-order prescriptions were limited to select mail order pharmacies who contracted for that purpose with ORX, and were part of a separate mail order network.  Upon information and belief, ORX refuses to admit independent pharmacies into this network.

104.    Upon information and belief, these changes to the 2015 Pharmacy Manual were part of Defendants' scheme to control and dominate the specialty pharmacy market.

105.    In order to obtain the Texas-based specialty drug medication business that Cedra Bronx had built, ORX invoked the recent changes to the ORX Pharmacy Manual and removed Cedra Bronx from the ORX network, barring a promise from Cedra Bronx not to ship out-of-state anymore.

106.     Facing the decimation of their entire business, Cedra Bronx, in April 2015, confirmed to ORX that it would not to ship any more out-of-state prescriptions, thus forfeiting the pharmacy's Texas patients – a devastating financial blow to Cedra Bronx.

*Defendant Catamaran's Pretextual Audit of Cedra Bronx*

107.     A mere month later, in May 2015, Catamaran also began implementing its part of the conspiracy to eliminate competition from the specialty market, including Cedra Bronx and any affiliated pharmacies.  Even with the loss of the Texas-based business, Cedra Bronx still maintained a substantial drug business, and Defendants thus continued to see them as a significant source of competition.

108.     Defendants thus set about on a course of unlawfully depriving Cedra Bronx of the business it had built up and developed.

109.     In or about May of 2015, Catamaran began conducting pre-textual audits and reviews of community pharmacies, including Plaintiffs, and using the purported "findings" as a basis for terminating the participation of independent pharmacies from their networks.

110.     In or about May of 2015, Catamaran audited Cedra Bronx.  The audit, when finalized, uncovered nothing beyond five minor discrepancies.  Upon information and belief, Defendants, however, prior to the audit, had already agreed, as part of its larger conspiracy, to eliminate Cedra Bronx Pharmacy.

111.     As part of this conspiracy, Catamaran also targeted another Cedra store—Cedra NYC—and three other non-Cedra branded pharmacies that shared overlapping ownership and/or affiliation with the Cedra Owners: K Drugs Inc. d/b/a Super Pharmacy Unica, Concordia Pharmacy Inc., and Tremont Chemists Inc. d/b/a Perla Pharmacy.

112.     Catamaran then subjected the five pharmacies to simultaneous audits.

- 23 -

113.    In the course of the audits, Catamaran ignored procedural rights afforded by New York laws as well as Catamaran's own procedures specified in the provider manual.

114.    Shortly upon commencing the audits, Catamaran notified the pharmacies that it was terminating their provider agreements.  The reason for the termination was the fact that all pharmacies were affiliated through common ownership, not because of any wrongdoing by individual pharmacies.

115.    Catamaran then immediately sent notices to the pharmacies' patients advising them that the pharmacies were being terminated from the network and requiring them to find different pharmacies.

116.    Only after Catamaran was threatened with a lawsuit did it back down and rescind the terminations.  However, Catamaran never retracted notices to the pharmacies' patients, causing the pharmacies to lose a substantial number of patients and suffer a great deal of reputational loss in a short period of time.

117.    This established a pattern that would repeat itself throughout Defendants' conspiracy: the use of economic extortion, via threats to pharmacies affiliated with the Cedra Owners, to achieve Defendants' means of dominating the specialty drug market.

**Defendants Continue Implementing the Conspiracy to Dominate the Specialty Drug Market; Defendants Conduct the Affairs of the RICO Enterprise(s) Through a Pattern of Racketeering and Extortion**

### *The Cedra Expansion*

118.    The Cedra Owners, following the loss of Cedra Bronx's Texas-based specialty pharmacy business, decided to make another attempt at that market and other markets outside the East Coast.

- 24 -

119.    In June 2015, Plaintiff Cedra Pharmacy Houston LLC acquired the assets of Uptown Pharmacy ("Uptown"), an ORX-enrolled pharmacy located at 1607 South Post Oak Lane, Houston, Texas 77056.

120.    Prior to the purchase and sale, Uptown was already serving ORX members as an enrolled pharmacy, and a significant number of patients typically stay with a pharmacy following a transfer of ownership.  Indeed, this assumption, *i.e.* the pharmacy's existing good will, is often a meaningful factor in negotiating consideration for the sale and purchase of pharmacy.

121.    Cedra Houston had thus had a more than reasonable expectation that it would be able to retain the ORX members that Uptown was serving prior to the changeover at the pharmacy.

122.    Early in 2016, the Cedra Owners also began the process of starting up Cedra Dallas, which received Texas licensure in or about April 2016.

123.    In 2017, Plaintiff Cedra Pharmacy Los Angeles LLC acquired the assets of Marc 1 Drugs Inc. d/b/a Payless Pharmacy VII ("Payless Pharmacy"), a pharmacy located at 1417 West Beverly Boulevard, Suite 103, Montebello, California 90640, and rebranded it Cedra LA. Similar to the purchase of Uptown Pharmacy in Houston, Payless Pharmacy had been ORX-enrolled, and the Cedra LA had a reasonable expectation of retaining the goodwill of the ORX members serviced by Payless Pharmacy.

124.    To prevent independent pharmacies, including Cedra-branded pharmacies, from expending into Texas and California, Defendants engaged in a pattern of economic extortion and anticompetitive conduct.

125.    In or about January 2016, Cedra Houston applied for network admission with ORX.  Under Federal law and regulations, a pharmacy seeking to serve Medicare Part D

- 25 -

members is entitled to participate in a plan sponsor's network under the same terms and conditions applicable to other pharmacies.  *See* 42 C.F.R. § 423.120(a)(8)(i).  Here, Cedra Houston sought to serve Medicare Part D members in the ORX network, and was ready to do so under the same the same terms and conditions applicable to other pharmacies.

126.     Similarly, under Texas law, ORX was obligated to admit any pharmacy into its network that is ready and willing to meet the same standards and conditions as other network pharmacies, *see* Tex. Ins. Code Ann. § 21.52B, which Cedra Houston was willing to do.

127.     These types of laws and regulations are commonly known as "Any Willing Provider" laws.

128.     As such, when Cedra Houston sought to join ORX's network, ORX's ability to arbitrarily deny entry to Cedra Houston was curbed by the Federal and Texas Any Willing Provider laws.  Indeed, Cedra Houston possessed protective rights against such conduct under the Federal and Texas Any Willing Provider Laws.

129.     Accordingly, Cedra Houston had a right to join ORX's network.

130.     As part of their conspiracy to eliminate competition, Defendants had no intention of allowing Cedra Houston entry into the ORX network.  Nor did Defendants have any intention of complying with Federal and Texas Any Willing Provider laws.

131.     Defendants imposed unreasonable, arbitrary, capricious, and impossible-to-meet conditions on Cedra Houston's admission into the ORX network.

132.     In furtherance of the conspiracy, in February 2016, Defendant UHC sent a letter to Cedra Houston that its Special Investigative Unit ("SIU") was commencing an on-site invoice reconciliation audit of Cedra Houston as part of the application review process.

133.    Such a procedure in connection with a new application for network participation by a new entity is unprecedented and illogical, and is an arbitrary and capricious way of denying a pharmacy's right to join the network.

134.    An invoice reconciliation audit ostensibly looks at a large number of claims submitted by a pharmacy to an insurance plan/PBM, and attempts to determine if the pharmacy has made enough inventory purchases from wholesalers to meet the number of claims submitted. It serves as a proxy to determine if a pharmacy is engaged in fraud or abuse by submitting claims for reimbursement of more medications that it had purchased from its wholesalers.

135.    Not only did UHC want to conduct a pre-enrollment audit of a brand-new pharmacy, but the manner in which UHC attempted to conduct the so-called audit was entirely contrary to the acceptable industry norms and common sense.

136.    Having made Cedra Houston's enrollment contingent upon the sham inventory audit, Defendants stalled and delayed Cedra Houston's application.  By June 2016, Cedra Houston had not yet received any initial findings from UHC, or the opportunity to challenge such findings.

137.    Despite UHC's lack of findings, by letter from ORX dated June 13, 2016, Cedra Houston's application was denied, for the stated reason that "credentialing documents not meeting our network contracting requirements".  Any findings, such as how or which credentialing documents were insufficient, were not provided.

138.    In June 2016, ORX advised Cedra Houston that its application for enrollment was denied due to "invoice shortages."  Cedra Houston was not given an opportunity to challenge these findings.

139.    Upon information and belief, UHC and ORX's conduct during the audit served multiple purposes: (i) it furthered Defendants' anticompetitive conspiracy to eliminate competition and dominate the specialty pharmacy market; and (ii) it placed financial pressure on Cedra Houston, in the hopes of forcing Cedra Houston into withdrawing its network application and forgoing its exercising, under Federal and Texas law, of its right and opportunity to serve consumers who had their pharmacy benefits administered by ORX.

140.    While the Cedra Houston application was still being "considered", in or about September 2016, Cedra Dallas submitted an application for enrollment in the ORX network.

141.    Under Federal and Texas law, Cedra Dallas had the right to participate in the ORX network.

142.    Cedra Dallas sought to serve Medicare Part D members under the ORX network, and was ready to do so under the same the same terms and conditions applicable to other pharmacies.

143.    Similarly, under Texas law, ORX was obligated to admit any pharmacy that is ready and willing to meet the same standards and conditions as other network pharmacies, *see* Tex. Ins. Code Ann. § 21.52B, which Cedra Dallas was willing to do.

144.    At first, Cedra Dallas received no response from Defendants regarding its application.  However, in January 2017, after numerous inquiries, ORX finally notified Cedra Dallas that its application was being denied because of its Cedra affiliation, particularly with Cedra Houston.

145.    Upon information and belief, ORX's denial of Cedra Dallas' application served multiple purposes: (i) furtherance of Defendants' anticompetitive conspiracy to eliminate competition and dominate the specialty pharmacy market; and (ii) to threaten the Cedra Owners

- 28 -

with economic harm, and thus force Cedra Houston into withdrawing its network application and forgoing its exercising, under Federal and Texas law, of its right and opportunity to serve consumers who had their pharmacy benefits administered by ORX.

146.     Defendants did so because they knew that under Federal and Texas law, Cedra Houston had the right to participate in the ORX network.  Defendants were thus forced to resort to unlawful means in order to prevent Cedra Houston's entry into the ORX network.

147.     In or about June 2017, Cedra LA submitted an application for admission into the ORX network.

148.     Under Federal law, Cedra LA had the right to participate and serve Medicare Part D members in the ORX network, and was ready to do so under the same the same terms and conditions applicable to other pharmacies.

149.     Additionally, under California law, Cedra LA has the common law right to fair procedure in the course of its application for admission into the ORX network.

150.     Defendants have violated Cedra LA's common law right to fair procedure: ORX first intentionally, arbitrarily and capriciously stalled Cedra LA's application.  For six months, ORX simply refused to act upon Cedra LA's application or provide any notice of the reasons for what amounted to an effective denial of Cedra LA's network application.  Then, by letter dated December 11, 2017, UHC gave notice that it would be conducting an invoice reconciliation review of Cedra LA – the exact same type of arbitrary and capricious process for network enrollment that Cedra Houston was subjected to.  Based upon information, belief, and a pattern of similar prior conduct, Defendants have already decided to refuse network admission to Cedra LA, and are now reverse-engineering the enrollment process to fit the predetermined outcome.

Moreover, Defendants have not afforded Cedra LA any opportunity to respond to the ongoing effective refusal of its entry into the ORX network, *i.e.* prior to and at a fair procedure hearing.

151.    Upon information and belief, ORX's refusal to consider Cedra LA's application served multiple purposes: (i) furtherance of Defendants' anticompetitive conspiracy to eliminate competition and dominate the specialty pharmacy market; and (ii) to threaten the Cedra Owners with economic harm, and force Cedra Houston and Cedra Dallas into withdrawing their network applications and forgoing their exercising, under Federal and Texas law, of their right and opportunity to serve ORX members.

152.    Defendants did so because they knew that under Federal and Texas law, Cedra Houston and Cedra Dallas had the right to participate in the ORX network.  Defendants were thus forced to resort to unlawful means in order to prevent Cedra Houston and Cedra Dallas' entry into the ORX network.

### *Defendants' Furtherance of the Conspiracy to Eliminate Competition; Further Pattern of Economic Extortion*

153.    In or about May 2017, in the face of Cedra Houston's persistent objections, ORX agreed to allow Cedra Houston to submit another application for admission into the ORX network – even though, under Federal and Texas law, there was absolutely no justification for denying the first application.

154.    Moreover, Defendants continued using their operation and control of the ORX network to engage in economic extortion.

155.    In June 2017, after the reapplication had been submitted, UHC again subjected Cedra Houston to an audit, this time based on the Cedra Houston's dispensing report for

- 30 -

December 4, 2016 through July 18, 2017 – which claims were with other PBMs, not ORX, and thus irrelevant to the credentialing decision.

156.     Moreover, audits based on dispensing reports are problematic and essentially incapable of producing reliable audit findings.

157.     By letter dated September 19, 2017, in violation of Federal and Texas law, ORX again denied Cedra Houston's application, without giving the final audit results or any other meaningful reason.

158.     Upon information and belief, ORX's latest flawed audit findings were part of the conspiracy to eliminate competition through unlawful means, including a pattern of racketeering, by delaying and obstructing Cedra Houston's right and opportunity, under Federal and Texas law, to be admitted into the ORX network and to serve consumers who had their pharmacy benefits administered by ORX; by delaying and obstructing Cedra Dallas' right, under Federal and Texas law, to be admitted into the ORX network and to serve consumers who had their pharmacy benefits administered by ORX; and by delaying and obstructing Cedra LA's right, under Federal and California law, to be admitted into the ORX network, to serve consumers who had their pharmacy benefits administered by ORX, and to receive fair process for its application to be admitted into the ORX network.

159.     Realizing that Plaintiffs would continue to persist in their attempts to vindicate their rights, Defendants conspired to attempt further economic extortion against Plaintiffs.

160.     In or about September 2017, while Cedra Houston's application was ongoing, Defendants decided to arbitrarily subject pharmacies affiliated with Plaintiffs to simultaneous audits.  Defendants UnitedHealth Group, UHC and ORX then audited Cedra Bronx and Cedra

NYC, as well as two other affiliated pharmacies, K Drugs Inc. d/b/a Super Pharmacy Unica, and Tremont Chemists Inc. d/b/a Perla Pharmacy.

161.    These audits ultimately concluded with no negative findings, but the timing of the simultaneous audits, which coincided with applications for Cedra Houston, Cedra Dallas, and Cedra LA, was meant to send a message to Cedra Owners: *back down*.

162.    Upon information and belief, all of these acts—the protracted, pretextual admission audit of Cedra Houston, the denial of Cedra Dallas' application, the delay and lack of fair process in Cedra LA's application, and the audits of the New York pharmacies—are all part of a pattern of economic extortion in the conducting of the affairs of the ORX network, designed to intimidate and force Plaintiffs to forgo the exercise of their right and opportunity, including under Federal and state law, to serve consumers who had their pharmacy benefits administered by ORX, as well forgo other procedural protections.

163.    This pattern of economic extortion is also part of and in furtherance of the broader conspiracy of the enterprise(s) controlled by Defendants, and of Defendants' scheme to dominate and control the specialty drug market.

### FIRST CAUSE OF ACTION
(Civil RICO - Violation of 18 U.S.C. § 1962(c))

164.    Plaintiffs repeat and reallege each of the allegations contained in Paragraphs "1" through "163" of the Complaint as if fully set forth herein.

### RICO Defendants

165.    At all relevant times, Defendant ORX was a "person" within the meaning of the RICO Act, 18 U.S.C. §§ 1961(3) and 1962(c).

- 32 -

166.     At all relevant times, Defendants UnitedHealth Group was a "person" within the meaning of the RICO Act, 18 U.S.C. §§ 1961(3) and 1962(c).

167.     At all relevant times, Defendant UHC was a "person" within the meaning of the RICO Act, 18 U.S.C. §§ 1961(3) and 1962(c).

168.     ORX, UnitedHealth Group and UHC are hereinafter collectively referred to as the "RICO Defendants".

**The RICO Enterprise(s)**

169.     ORX, on behalf of its plan sponsors, contracts and associates with thousands of pharmacies nationwide to form a structured PBM pharmacy network that engages in the business of offering and dispensing prescription drugs to individuals, and establishing and processing payment for such drugs.

170.     This PBM pharmacy network is a cohesive group with specific and assigned responsibilities and a command structure, and constitutes an association-in-fact enterprise amongst ORX, its affiliated plan sponsors, and its network pharmacies within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c), referred to hereinafter as the "Network Enterprise".

171.     Each of the RICO Defendants participated in the operation or management of the Network Enterprise.

172.     The Network Enterprise provides health insurers and plans' members with a mechanism to fill prescriptions in multiple locations under the terms of their health plan and to process the payment for such prescriptions. Thus, the Network Enterprise maintains an existence separate and apart from the pattern of racketeering activity through which its affairs are conducted by the RICO Defendants.

- 33 -

173.     The Network Enterprise is an ongoing organization that maintains an identifiable structure and a decision-making framework. Health insurers and plans, including UnitedHealth Group, sponsor plans in the Network Enterprise, ORX and/or UHC manage access to, and administration of, the Network Enterprise, and pharmacies, once admitted into the Network Enterprise, provide services to members under the Network Enterprise.

174.     The Network Enterprise thus has an established control mechanism and hierarchy. Pharmacies must be admitted into the Network Enterprise following review by UHC, and they are then supervised and managed by ORX.

175.     The Network Enterprise is engaged in and affects interstate commerce through its processing of prescription drug claims under national health plans. It not only utilizes interstate commerce, through the mails and wires, to process an individual's health plan benefits, but also facilitates the flow of significant monies (for payment of the prescribed drugs) in and out of interstate commerce.

176.     Alternatively, or in addition to the Network Enterprise, an association-in fact enterprise exists between Defendants UnitedHealth Group, ORX, UHC, Catamaran, Briova and Salveo within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c), referred to hereinafter as the "United Enterprise". While the organization of the United Enterprise has changed over time, and some of its members have becomes independent subsidiaries of other members, and its members may have held different roles at different times, the United Enterprise has generally been structured to operate as a unit in order to accomplish the goals of their racketeering scheme.

177.     Each of the RICO Defendants participated in the operation or management of the United Enterprise.

S&G/685/40/0049237

178.     The United Enterprise maintains an identifiable structure and decision-making framework, which consists of two PBMs—ORX and Catamaran—as well as UHC, which provides network contracting support services, and its separate specialty pharmacy business, including Defendants Briova and Salveo.

179.     Upon information and belief, ORX and Catamaran purport to operate independently of Defendants UnitedHealth Group and UHC.  This is because Defendants ORX and Catamaran each seek the business of outside health plans, who would be reluctant to work with ORX and Catamaran absent assurances that their proprietary information will not be accessed by their competitors, *i.e.* Defendants UnitedHealth Group and UHC.  Thus, upon information and belief, Defendants claim that a firewall exists between Defendants UnitedHealth Group/UHC and ORX/Catamaran.

180.     The United Enterprise maintains an existence separate and apart from the pattern of racketeering activity through which its affairs are conducted: providing health care and pharmacy benefit management services, as well as specialty pharmacy services.

181.     The United Enterprise is an ongoing organization that utilizes interstate commerce, including the mails and wires, in providing, among other things, nationwide PBM services to health plan clients and mail order and specialty pharmacy services. The United Enterprise additionally affects interstate commerce through its significant profits, which flow in and out of interstate commerce.

**Pattern of Racketeering Activity: Extortion in Violation of the Hobbs Act, 18 U.S.C § 1951**

182.     The RICO Defendants conducted or participated, directly or indirectly, in the conduct, management, or operation of the Network Enterprise's affairs through a "pattern of

- 35 -

racketeering activity" within the meaning of 18 U.S.C. § 1961(5) and in violation of 18 U.S.C § 1962(c).

183.    Additionally and/or alternatively, the RICO Defendants conducted or participated, directly or indirectly, in the conduct, management, or operation of the United Enterprise's affairs through a "pattern of racketeering activity" within the meaning of 18 U.S.C. § 1961(5) and in violation of 18 U.S.C § 1962(c).

184.    Specifically, as described herein, the RICO Defendants, through the Network Enterprise and/or United Enterprise, have engineered a wide-ranging campaign to economically extort Plaintiffs, by repeatedly threatening Plaintiffs and/or the Cedra Owners with economic harm in order to coerce Cedra Houston, and ultimately Cedra Dallas and Cedra LA, into respectively forgoing their exercising of their right and opportunity, under Federal and state law, to service consumers whose pharmacy benefits were administered by ORX in their respective geographical areas.

185.    RICO Defendants UnitedHealth, UHC and ORX subjected Cedra Houston to arbitrary, capricious and protracted audits, and apparently intend to subject Cedra LA to similar audits.  RICO Defendants' audits concluded with pretextual, demonstrably false findings, in the hopes of financially decimating Cedra Houston to the point where it would have no choice but to withdraw its network application, and thus forgo the opportunity to service consumers in the area whose pharmacy benefits were administered by ORX, including but not limited to consumers who had previously patronized Uptown Pharmacy in Houston prior to its acquisition by Cedra Houston,  and Payless Pharmacy in Los Angeles prior to acquisition by Cedra LA.  Plaintiff, including Cedra Houston and Cedra LA, had a more than reasonable expectation of being able to continue serving the patrons of Uptown Pharmacy and Payless Pharmacy, respectively.

186.    RICO Defendants did so with the intention of keeping, exclusively for themselves, the right and opportunity to provide pharmacy *services* to consumers in the area whose pharmacy *benefits* were administered by ORX for themselves, to the greatest extent possible.

187.    RICO Defendants UnitedHealth and ORX then denied the network application of Cedra Dallas, in the hopes that the threats of economic harm placed on the Cedra Owners would force Cedra Houston to withdraw its network application.

188.    RICO Defendants did so with the intention of keeping, the right and opportunity to provide pharmacy *services* consumers in the area whose pharmacy *benefits* were administered by ORX, to the greatest extent possible.

189.    Currently, RICO Defendants UnitedHealth and ORX are refusing to approve the network application of Cedra LA, again in the hope that the financial pressure placed on the Cedra Owners would force Cedra Houston and/or Cedra Dallas to withdraw their network application(s).

190.    RICO Defendants did so with the intention of keeping, exclusively for themselves, the right and opportunity to provide pharmacy *services* to consumers in the area whose pharmacy *benefits* were administered by ORX, to the greatest extent possible.

191.    Additionally, RICO Defendants arranged for the simultaneous audit of four New York pharmacies affiliated with Plaintiffs, in order to send a thinly-veiled threat to Plaintiffs that their continued attempt to join ORX's network and expand their operations would result in harm to the Cedra Owners, in the hope that the financial pressure placed on the Cedra Owners would induce Cedra Houston, Cedra Dallas, and Cedra LA to withdraw their network applications, and thus forgo the opportunity to service consumers in their respective areas whose pharmacy

- 37 -

benefits were administered by ORX, including but not limited to consumers who had previously patronized Uptown Pharmacy in Houston and Payless Pharmacy in Los Angeles, whom Cedra Houston and Cedra LA, respectively, had more than reasonable expectation of being able to continue serving.

192.    RICO Defendants did so with the intention of keeping the right and opportunity to service consumers in these areas whose pharmacy benefits were administered by ORX exclusively for themselves, to the greatest extent possible.

193.    These actions, as described herein, have created a reasonable fear of harm on the part of Plaintiffs and the Cedra Owners, including fear of economic loss.

194.    Accordingly, the RICO Defendants have unlawfully obstructed, delayed, and affected, and attempted to obstruct, delay, and affect commerce as that term is defined in the Hobbs Act, 18 U.S.C. § 1951, and the movement of articles and commodities in such commerce, by extortion, as that term is defined in § 1951, in that the RICO Defendants attempted to induce Plaintiffs to forgo and relinquish their respective rights and opportunities, including under Federal and state law, to service consumers in their respective areas whose pharmacy benefits were administered by ORX, through the wrongful use of actual and threatened force, violence, and fear – including fear of economic harm.

195.    In all such instances of violating the Hobbs Act through economically extorting Plaintiffs, RICO Defendants did so with the intention of keeping the right and opportunity to service consumers whose pharmacy benefits were administered by ORX exclusively for themselves, to the greatest extent possible.

196.    Each of the RICO Defendants has thus engaged in multiple predicate acts, as described *supra*. The conduct of each of the RICO Defendants described constitutes a pattern of

S&G/685/40/0049237

racketeering activity within the meaning of 18 U.S.C. § 1961(5).

197.    Plaintiffs were each injured in their business and property by reason of the RICO

Defendants' violations of 18 U.S.C. § 1962(c). The injuries to Plaintiffs caused by reason of the

violations of 18 U.S.C. § 1962(c) include but are not limited to damage to Plaintiffs' reputation

and goodwill and the impairment of Plaintiffs' business prospects, as well as attorneys' fees and

costs to defend itself in improperly motivated sham audits and/or advocate for Plaintiffs to be

afforded their rightful access to the ORX network.

198.    Further, these injuries to Plaintiffs were a direct, proximate, and reasonably

foreseeable result of the violation of 18 U.S.C. § 1962. Plaintiffs are the ultimate victim of the

RICO Defendants' unlawful conduct. Plaintiffs have been and will continue to be injured in its

business and property in an amount to be determined at trial.

199.    Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to recover treble damages

plus costs and attorneys' fees from the RICO Defendants.

### SECOND CAUSE OF ACTION
(RICO Conspiracy - Violation of 18 U.S.C. § 1962(d))

200.    Plaintiffs repeat and reallege each of the allegations contained in Paragraphs "1"

through "199" of the Complaint as if fully set forth herein.

201.    The RICO Defendants have unlawfully, knowingly and willfully combined,

conspired, confederated and agreed together and with others to violate 18 U.S.C. § 1962(c) as

described above the First Cause of Action, in violation of 18 U.S.C. § 1962(d).

202.    Upon information and belief, the RICO Defendants knew that they were engaged

in a conspiracy to commit the predicate acts, *i.e.* economic extortion in violation of the Hobbs

Act, and they knew that the predicate acts were part of such racketeering activity, and the

- 39 -

participation and agreement of each of them was necessary to allow the commission of this pattern of racketeering activity.

203.    This conduct constitutes a conspiracy to violate 18 U.S.C. § 1962(c), in violation of 18 U.S.C. § 1962(d).

204.    Upon information and belief, the RICO Defendants agreed to conduct or participate, directly or indirectly, in the conduct, management, or operation of the affairs of the Network Enterprise and/or the United Enterprise, through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).

205.    Each RICO Defendant knew about and agreed to facilitate the scheme to coerce Plaintiffs, under threat of economic harm, to forgo and relinquish their respective rights and opportunities, including under Federal and state law, to service consumers in their respective areas whose pharmacy benefits were administered by ORX, through the wrongful use of actual and threatened force, violence, and fear – including fear of economic harm.

206.    Each RICO Defendant knew about and agreed to facilitate the scheme to violate the Hobbs Act through economically extorting Plaintiffs, with the intention of keeping, exclusively for themselves, the right and opportunity to provide pharmacy services to consumers whose pharmacy benefits were administered by ORX, to the greatest extent possible.

207.    It was part of the conspiracy that the RICO Defendants would commit a pattern of racketeering activity in the conduct of the affairs of the Network Enterprise and/or the United Enterprise, including the acts of racketeering set forth *supra*.

208.    As a direct and proximate result of the RICO Defendants' conspiracy, the acts of racketeering activity involving the Enterprise(s), the overt acts taken in furtherance of that conspiracy, and violations of 18 U.S.C. § 1962(d), Plaintiffs has been injured in their businesses

- 40 -

and property, including but are not limited to damage to Plaintiffs' reputation and goodwill and the impairment of Plaintiffs' business prospects, as well as attorneys' fees and costs to defend itself in improperly motivated sham audits, including the attorneys' fees and costs associated with exposing the RICO Defendants' economic extortion.

209.    Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to recover treble damages plus costs and attorneys' fees from the RICO Defendants.

### THIRD CAUSE OF ACTION
(Unlawful Restraint of Trade in Violation of § 1 of the Sherman Act)

210.    Plaintiffs repeat and reallege each of the allegations contained in Paragraphs "1" through "209" of the Complaint as if fully set forth herein.

211.    As is alleged in this Complaint, Defendants have combined, conspired, and engaged in a concerted effort to unreasonably restrain trade and commerce among the several states, and actually created a monopoly in the line of interstate commerce in violation of the provisions of 15 U.S.C. § 1 et seq., and in particular the Sherman Antitrust Act, and the Clayton Act, by eliminating the Plaintiffs and other independent pharmacies as competition for the specialty drug market.

212.    Plaintiffs have been injured in its business and property by reason of the doing of those acts in violation of the antitrust laws, and are threatened by future harm.

### Trade and Interstate Commerce

213.    The provision and sale of specialty drugs, and insurance coverage for such services and products related to the Plaintiffs, are each in, and effect, interstate commerce.

- 41 -

214.     Many of the activities of Defendants in administering and processing prescription drug benefits in every state are in the regular, continuous and substantial flow of interstate commerce, and have a substantial effect on interstate commerce.

215.     Many of the described acts in Defendants' conspiracy had, and continues to have, a direct, substantial, and reasonably foreseeable effect on United States commerce.

**The Relevant Market**

216.     The relevant service market affected by Defendants' conduct is the specialty pharmacy market that are reimbursed by insurance, including, but not limited to, the dispensing of prescriptions.  The relevant product market affected by Defendants conduct are prescription drugs reimbursed by insurance, including, but not limited to, specialty drugs such as those used to treat Hepatitis C.

217.     The relevant geographic market is the United States, including, but not limited to, the State of Texas and the State of California.

218.     Defendants, by administering the drugs benefits of 65 million Americans, control a significant portion of the relevant market.

219.     Defendants' conspiracy had the unlawful effect of restraining and eliminating competition in the provision of pharmacy services, in particular the dispensing of specialty drugs, in all markets which Plaintiffs and other independent pharmacies did and could operate in interstate commerce.

**Defendants' Concerted Action to Unreasonably Restrain the Relevant Market**

220.     Defendants conspired, combined and agreed to unlawfully restrain and suppress trade, by entering into horizontal agreements to eliminate Plaintiffs and other community

- 42 -

pharmacies as competitors, as well as to unjustifiably boycott and refuse to deal with Plaintiffs and other independent pharmacies.

221.    Defendants also monopolized the relevant market by vertical mergers with various specialty pharmacies, who themselves engaged in horizontal mergers, such as the merger of Briova and Salveo, and their later merger with the ORX specialty pharmacy.

222.    Upon information and belief, various corporate acquisitions and transactions entered into by and amongst Defendants, such as the merger of Salveo and Catamaran/Briova, and the merger between Catamaran and ORX, were for the purpose of unlawfully and unreasonably restraining trade.

223.    These acts have unreasonably restrained trade, to the detriment of consumers, in that they eliminated or threaten to eliminate community pharmacies, such as Plaintiffs, as well as the benefits their competition provides, such as the herein described increased quality of service.

**Defendants' Conspiracy to Eliminate Competition from the Specialty Drug Market**

224.    As a result of their desire to capture and control the specialty drug market, Defendants, upon information and belief, agreed and conspired to initiate a targeted campaign to restrain trade, specifically that of the Plaintiffs' and other independent pharmacies' Hepatitis C drug business.

225.    To accomplish this, Defendants, upon information and belief, have conspired to deny independent specialty pharmacies who may pose a competitive threat to them, including Plaintiffs, access to the ORX network.

226.    Defendants ultimately decided that they could achieve market control through multiple improper, unlawful, anti-competitive mergers, the last of which between Catamaran and ORX concluded in July of 2015, following, upon information and belief, over seventeen months

- 43 -

of active conspiring to destroy their community-based competition.  Upon information and belief, one of the main purposes of this merger was to control the highly lucrative specialty drug market, and eliminate the remaining competition.

227.    Immediately following the merger between Catamaran/Briova and Salveo, and then following the merger between Catamaran and ORX, Defendants began feverishly implementing their plan to completely eradicate all competition posed by independent pharmacies, including the Plaintiffs, by forcing them into insolvency or never even letting their business get off the ground.

228.    In the case of Cedra Houston and Cedra Dallas, Defendants identified these Plaintiffs as potential competitors based on Cedra Bronx's prior success in the Texas market. Defendants also assumed that Cedra LA would be a potential competitor to Salveo in California, based on the general past success of the Cedra Owners, including the Cedra Owners' pharmacies recently controlling nearly $30 million worth of specialty drug business.

229.    Accordingly, in furtherance of Defendants' unlawful merger and conspiracy to eliminate competition from the specialty drug market, Defendants refused to allow Plaintiffs into the combined ORX/Catamaran network.

230.    Defendants activities hereinabove set forth constitute violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, as Defendants engaged in unlawful contract, combination, or conspiracy to unreasonably restrain trade and commerce in the relevant market.

231.    Defendants, including but not limited to UnitedHealth Group, ORX, Catamaran, Briova and Salveo contracted, combined, and conspired to restrain trade in the relevant market by entering into a horizontal agreement to boycott and/or refuse to deal with Plaintiff and other

- 44 -

independent pharmacies and/or otherwise exclude Plaintiffs and other independents pharmacies from the relevant market and thus destroy their businesses.

232.    Defendants, including but not limited to UnitedHealth Group, ORX and Catamaran, effectuated this boycott and/or refusal to deal by jointly engaging in conduct, such as multiple mergers, calculated to create an entity exercising absolute control over community pharmacies and then, through abusive and unlawful tactics, deny and/or terminate their participation in the network.

233.    Defendants, including but not limited to UnitedHealth Group, UHC, ORX and Catamaran, use non-existent invoice discrepancies, sham admission audits, and purported "ownership links" as a mere pretext to deny and/or terminate Plaintiffs' and other similarly situated pharmacies' access into Defendants' networks.

234.    Upon information and belief, the primary reason Defendants, including but not limited to UnitedHealth Group, ORX, and Catamaran, are attempting to prevent Plaintiffs and other community pharmacies from its participating in their provider network is to keep all specialty medication business for its in-house network pharmacies, including the now-merged Defendants Salveo and Briova.

235.    Indeed, UnitedHealth's CEO recently stated, regarding Defendants, that:

> "We have strong momentum in specialty pharmacy, where we expect full year 2017 revenues to increase 20% over last year and growth momentum to continue into 2018. Our synchronized, data-driven approach to specialty pharmacy integrates pharmacy and medical engagement. We then drive customer satisfaction by delivering strong service and personalizing the patient's experience across the breadth of information channels they choose to use."

236.    Defendants are thus open about their desire to act in concert for the purpose of furthering their lucrative growth in, and domination of, the specialty drug market.

- 45 -

237.    This concerted anti-competitive action was a per se violation of Section 1 of the Sherman Act, because:

      a.      Defendants' conspiracy prior to the Catamaran/ORX merger, as well as the Catamaran/ORX merger itself, was a horizontal agreement between Defendants, both of whom are PBMs and operate at the same level of the prescription drug benefit market;

      b.      The conspiracy, when carried out, acted to exclude Plaintiffs and other independent pharmacies from access to reimbursements from several major health insurers and prescription medication plans, including the number one insurer in the United States, Defendants UnitedHealth and/or UHC. These reimbursements are a supply, facility, or market that are vitally necessary for Plaintiffs and other independent pharmacies, without which they are incapable of competing in the relevant market;

      c.      Defendants possess a dominant market position in the relevant market— approximately 22%. There are only two other PBMs with larger market shares— together, the three PBMs control over 75% of the market—and Defendants are rapidly closing the gap. Defendants are able to use, and in fact do use their combined market share, to exercise control over and/or substantially affect the purchase and sale of pharmaceutical services and prescription drugs and specialty drugs in the relevant market;

      d.      Defendants' concerted conduct cannot plausibly be justified by arguments that it was intended for economic efficiency and to improve competition in the relevant market. Indeed, the concerted activity acted to destroy competition and divert

- 46 -

the patients of independent pharmacies to the Defendants' own in-house network pharmacies;

e.      Market consumers will be harmed as a result of Defendants' actions to destroy competition, namely in that there will be less competition; worse patient outcomes; lower quality of service; delays in patients receiving drugs; less choices with respect to specialty drugs as a result of Defendants' exclusive contracts with drug manufacturers, which are based on the rebates received by Defendants, not what best serves the patients.

238.    As a direct and proximate result of Defendants' concerted actions, Plaintiffs suffered and continue to suffer damages, in an amount to be determined at trial.

239.    Plaintiffs have no adequate remedy at law for the injury and damages alleged herein.

<u>**FOURTH CAUSE OF ACTION**</u>
(Monopolization of the PBM Market in Violation of § 2 of the Sherman Act)

240.    Plaintiffs repeat and reallege each and every allegation in paragraphs "1" through "239" of the Complaint as if fully set forth herein.

241.    Defendants activities hereinabove set forth constitute violations of Section 2 of the Sherman Act, 15 U.S.C. § 2, as Defendants, by the means set forth above, monopolized and attempted with specific intent to monopolize the relevant market, and there is a substantial probable threat that Defendants' conduct will result in an actual monopolization as well as greater monopolization of the relevant market in the future.

- 47 -

242.    In doing so, Defendants knowingly and intentionally, and with specific intent to do so, used their power as an indispensable PBM to foreclose or attempt to foreclose community pharmacy competition and divert to themselves more specialty pharmacy businesses.

243.    Defendants' monopolization and attempted monopolization have an overwhelmingly anti-competitive effect on the relevant market, with no added benefit to consumers. In fact, as described hereinabove, consumers will suffer as a result of this monopolization and attempted monopolization

244.    As a direct and proximate result of Defendants' actions, Plaintiffs suffered and continue to suffer damages.

## FIFTH CAUSE OF ACTION
(Monopolization of the PBM Market in Violation of § 7 of the Clayton Act)

245.    Plaintiffs repeat and reallege each and every allegation in paragraphs "1" through "244" of the Complaint as if fully set forth herein.

246.    Defendants activities hereinabove set forth constitute violations of the Clayton Act, 15 U.S.C. § 18, as Defendants' horizontal merger would tend to, and in fact would, substantially lessen competition and create a monopoly in the relevant market.

247.    ORX, prior to the merger, controlled approximately 13% of the relevant market, while Catamaran controlled approximately 9% of the relevant market.

248.    Their combined market shares allow Defendants to exercise control over the relevant market.

249.    Alternatively, their merger creates and contributes to "oligopolistic" conduct in concert with the other two large PBMs with similar market share, namely Express Scripts Inc. (29% market share), and CVS Caremark (24% market share).

250.    Defendants' monopolization and attempted monopolization as a result of their merger have an overwhelmingly anti-competitive effect on the relevant market, with no added benefit to consumers.  In fact, as described hereinabove, consumers will suffer as a result of this monopolization and attempted monopolization.

251.    As such, the merger is inherently unlawful.

252.    As a direct and proximate result of Defendants' actions, Plaintiffs suffered and continue to suffer damages.

## SIXTH CAUSE OF ACTION
(Unfair Competition under Texas Common Law)

253.    Plaintiffs repeat and reallege each and every allegation in paragraphs "1" through "252" of the Complaint as if fully set forth herein.

254.     Through the wrongful conduct described above, Defendants engaged in unfair methods of competition, unconscionable acts or practices, and unfair and deceptive acts or practices, including deceptive audit practices, economic extortion, and creating significant obstacles to Plaintiffs' entry into the ORX network

255.    The illegal acts by Defendants, including their violations of federal RICO and antitrust laws, and tortious interference with Plaintiffs' prospective business relationships, interfered with Plaintiffs' ability to conduct their business.

256.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs have suffered and will continue to suffer economic losses and irreparable injuries.

## SEVENTH CAUSE OF ACTION

- 49 -

(Tortious Interference with Prospective Business Relationships under Texas Common Law)

257.    Plaintiffs repeat and reallege each and every allegation in paragraphs "1" through "256" of the Complaint as if fully set forth herein.

258.    Cedra Houston, when purchasing the assets of Uptown Pharmacy, an ORX-enrolled pharmacy, including Uptown Pharmacy's goodwill, had a reasonable and valid expectation that it would be able to continue serving ORX members previously served by Uptown Pharmacy, since, in the ordinary course of business, a significant portion of a pharmacy's customers will continue patronizing a pharmacy following a sale of the business.

259.    Defendants were aware the interference was certain or substantially certain to occur as a result of their refusal to grant Cedra Houston entry into the ORX network.

260.    Defendants knew that under Federal and Texas law, Plaintiffs had the right to participate in the ORX network, and Defendants had a lawful obligation to grant Plaintiffs entry into the ORX network.

261.    Through the wrongful conduct described above, Defendants acted intentionally or with a conscious desire to prevent the relationships from occurring or knew the interference was certain or substantially certain to occur as a result of Defendants' conduct.

262.    Defendants' conduct is without justification or excuse and constitutes unlawful, tortious, wrongful, unfair, and intentional malicious interference with Plaintiffs' advantageous prospective business relationships, and Plaintiffs have been actually damaged as a result.

263.    As a direct and proximate result of Defendant's wrongful conduct, Plaintiffs have suffered and will continue to suffer economic losses and irreparable injuries.

264.    Defendants intentionally interfered with Plaintiffs' ability to serve their customer base through illegal and improper means.

265.     The interference by Defendants rendered Plaintiffs incapable of serving Uptown Pharmacy's customer base.

266.     As a direct and proximate result of Defendants' actions, Plaintiffs suffered and continue to suffer damages.

267.     Due to Defendants' tortious interference, Plaintiffs have sustained damages in an amount to be proven at trial.

## EIGHTH CAUSE OF ACTION
### (Violation of Fair Procedure under California Common Law)

268.     Plaintiffs repeat and reallege each and every allegation in paragraphs "1" through "267" of the Complaint as if fully set forth herein.

269.     Under California common law, the doctrine of fair procedure protects health care providers against arbitrary decisions, by private organizations such as Defendants, with regard to network expulsions and/or exclusions.

270.     Here, Defendants are one of the three largest PBMs in the United States.  Based on Defendants' vast power and control over the pharmacy services market in California, their refusal to admit an ordinary pharmacy into the ORX network would significantly impair the ability of a pharmacy to operate in California, and more specifically the Greater Los Angeles area, thereby affecting an important, substantial economic interest.

271.     As such, Defendants may not expel or exclude qualified California pharmacies without acting in a manner that is substantively rational and procedurally fair.

272.     Moreover, there are a significant number of ORX members residing in California, and as such the refusal to admit a pharmacy into the ORX network thus impacts the public interest.

- 51 -

273.     Defendants have simply refused to act on Cedra LA's application for network admission, and/or applied an arbitrary and capricious process for network enrollment, thus effectively and/or actually refusing to admit Cedra LA into the ORX network.

274.     Defendants' ongoing refusal to approve Cedra LA's admission into the ORX network, or to consider Cedra LA's application, or to provide a fair enrollment process, significantly impairs the ability of Cedra LA to operate a pharmacy in California – an important, substantial economic interest.

275.     Moreover, Defendants' refusal to admit Cedra LA into the ORX network or even act on Cedra LA's application is arbitrary, capricious and withholds fair process—including but not limited to a decision on the merits of Cedra LA's application, notice of the reason(s) for denial and a reasonable opportunity to respond, *i.e.* prior to and at a hearing—from Cedra LA.

276.     As a direct result of Defendants' actions, Cedra LA has been denied fair process under California common law.

277.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs, including Cedra LA, have suffered and will continue to suffer economic losses and irreparable injuries and damages, in an amount to be proven at trial.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs respectfully pray that this Court:

(1)     award Plaintiffs a judgment against Defendants in an amount to be determined at trial to compensate Plaintiffs for all financial loss and injury as a direct result of Defendants' illegal actions;

(2)     award treble damages;

- 52 -

(3)      award Plaintiffs their costs, disbursements and attorney fees; and

(4)      grant Plaintiffs such other and further relief as may be just and proper.


## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, the Plaintiffs demand a trial

by in this action of all issues so trialble.

Dated:  December 18, 2017

                                        Respectfully submitted:

                                        **LEICHTER LAW FIRM, PC**

                                        By: */s/ Louis Leichter*
                                                Louis Leichter
                                                Attorney-in-Charge
                                                State Bar No. 24000243
                                                Fed. ID No. 429733
                                                1602 East 7th Street
                                                Austin, TX  78702
                                                Tel.:  (512) 495-9995
                                                Fax:   (512) 482-0164
                                                Email: louis@leichterlaw.com

                                        **ATTORNEYS FOR PLAINTIFFS**