United States District Court
Southern District of Texas

**ENTERED**

March 07, 2019

David J. Bradley, Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| CEDRA PHARMACY HOUSTON, LLC, | § | |
| JAMMZ CHEMISTS LLC d/b/a CEDRA | § | |
| DALLAS, and CEDRA PHARMACY LOS | § | |
| ANGELES LLC, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| V. | § | CIVIL ACTION NO. H-17-3800 |
| | § | |
| UNITEDHEALTH GROUP, INC., UNITED | § | |
| HEALTHCARE SERVICES, INC., | § | |
| OPTUMRX, INC. CATAMARAN | § | |
| CORPORATION, CATAMARAN PBM OF | § | |
| ILLINOIS, INC., CATAMARAN, LLC, | § | |
| BRIOVARX OF MAINE, INC., BRIOVARX, | § | |
| LLC, and SALVEO SPECIALTY | § | |
| PHARMACY, INC., | § | |
| | § | |
| Defendants. | § | |



## MEMORANDUM AND RECOMMENDATION

Pending in this case that has been referred for all further pretrial proceedings is Defendants'

Motion to Dismiss Plaintiffs' Complaint (Document No. 16). Having considered the motion, the

response in opposition, the parties' additional briefing, the argument at a status conference held on

January 23, 2019, the allegations in Plaintiffs' Complaint, and the applicable law, the Magistrate

Judge RECOMMENDS, for the reasons set forth below, that Defendants' Motion to Dismiss

(Document No. 16) be GRANTED.

## I.    Background

This is essentially an unfair competition case brought by three specialty pharmacies, Cedra

Pharmacy Houston, LLC ("Cedra Houston"), Jammz Chemists, LLC d/b/a Cedra Dallas ("Cedra

Dallas") and Cedra Pharmacy Los Angeles LLC ("Cedra LA"), against three groups of Defendants: (1) United Health Group, Inc. and United Healthcare Services, Inc. (the "United Defendants"); (2) OptumRx, Inc. ("ORX")[1]; and (3) Briovarx of Maine, Inc., Briovarx, LLC and Salveo Specialty Pharmacy, Inc. (referred to hereafter as "specialty pharmacy defendants"), who Plaintiffs allege have conspired to exclude them from participating in the pharmacy network maintained by pharmacy benefit manager ORX on behalf the United Defendants. According to Plaintiffs, they each applied for admission into Defendant ORX pharmacy network, and each application was either denied, or refused consideration. Plaintiffs maintain that the denial of their applications was not based on any legitimate reason, but was instead based on Defendants' desire to dominate and control the specialty drug market for themselves, and to the exclusion of Plaintiffs.

Plaintiffs have alleged eight causes of action in their Complaint: (1) a Civil RICO claim against the United Defendants and ORX (18 U.S.C. § 1962(c)); (2) a RICO Conspiracy claim against the United Defendants and ORX (18 U.S.C. § 1962(d)); (3) an unlawful restraint of trade claim against all Defendants under § 1 of the Sherman Act (15 U.S.C. § 1); (4) a monopolization of the pharmacy benefit market (PBM) claim against all Defendants under § 2 of the Sherman Act (15 U.S.C. § 2); (5) a monopolization of the PBM market claim against all Defendants under § 7 of the Clayton Act (15 U.S.C. § 18); (6) an unfair competition claim against all Defendants under Texas common law; (7) a tortious interference with prospective business relationships claims by Plaintiff Cedra Houston against all Defendants under Texas law; and (8) Plaintiff Cedra LA's fair procedure

---

[1] Plaintiffs also named Catamaran Corporation, Catamaran PBM of Illinois, Inc, and Catamaran LLC as Defendants. As posited by Defendants, and not refuted by Plaintiffs in any respect, those Catamaran Defendants – Catamaran Corporation, Catamaran PBM of Illinois, Inc., and Catamaran LLC – no longer exist. *See* Defendants Motion to Dismiss (Document No. 16) at 1, fn. 1; Defendants' Certificate of Interested Parties (Document No. 15).

claim against Defendants under California common law. Defendants move for dismissal of all these claims under Rule 12(b)(6) for failure to state a claim upon which relief may be granted.

## II.     Standard of Review – 12(b)(6)

Rule 12(b)(6) provides for dismissal of an action for "failure to state a claim upon which relief can be granted." FED. R. CIV. P. 12(b)(6). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S.Ct. 1937, 1949 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is said to be plausible if the complaint contains "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 129 S.Ct. at 1949. Plausibility will not be found where the claim alleged in the complaint is based solely on legal conclusions, or a "formulaic recitation of the elements of a cause of action." *Twombly*, 550 U.S. at 555. Nor will plausibility be found where the complaint "pleads facts that are merely consistent with a defendant's liability" or where the complaint is made up of "'naked assertions devoid of further factual enhancement.'" *Iqbal*, 129 S.Ct. at 1949 (quoting *Twombly*, 550 U.S. at 557)). Plausibility, not sheer possibility or even conceivability, is required to survive a Rule 12(b)(6) motion to dismiss. *Twombly*, 550 U.S. at 556-557; *Iqbal*, 129 S.Ct. at 1950-1951.

In considering a Rule 12(b)(6) motion to dismiss, all well pleaded facts are to be taken as true, and viewed in the light most favorable to the plaintiff. *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974). But, as it is only *facts* that must be taken as true, the court may "begin by identifying the pleadings that, because they are no more than conclusions, are not entitled to the assumption of

3

truth." *Iqbal*, at 1950.  It is only then that the court can view the well pleaded *facts*, "assume their veracity and [ ] determine whether they plausibly give rise to an entitlement to relief." *Iqbal*, at 950.

## III.   Discussion

Prior to consideration of Plaintiffs' claims, and Defendants' arguments for dismissal of those claims, it is important to note that several of the Defendants named by Plaintiffs, referred to herein as the Catamaran Defendants (Catamaran Corporation, Catamaran PBM of Illinois, Inc., and Catamaran, LLC), do not exist, and have not existed as separate, independent entities since 2015, when they were acquired by the United Defendants and otherwise merged with Defendant ORX. That acquisition and merger pre-dated most of the conduct about which Plaintiffs complain in this case, including most particularly, Plaintiffs' exclusion from the ORX network, which occurred in 2016 and 2017.

### A.   RICO  Claims – Claims 1 and 2

Defendants argue that Plaintiffs have not alleged plausible RICO claims because they have not alleged a RICO "enterprise," have not alleged that the RICO Defendants conducted the affairs of a RICO enterprise, have not alleged a racketeering activity, and have not alleged a pattern of racketeering.  These pleading allegations are crucial to a RICO claim.

A plaintiff in a civil action may recover damages under the RICO statute, 18 U.S.C. § 1961, *et seq.*, if he is able to allege and prove: 1) a violation of 18 U.S.C. § 1962(a), (b), (c), or (d), and 2) injury to business or property as a result of such violation.[2]  18 U.S.C. § 1964(c) ("Any person

---

[2] The requirement that a RICO plaintiff plead and prove injury as a result of a violation of § 1962 is a standing requirement.  *Price v. Pinnacle Brands, Inc.*, 138 F.3d 602, 606 (5th Cir. 1998) (To have standing to maintain a RICO claim, a plaintiff must be able to plead and prove

injured in his business or property by reason of a violation of section 1962 of this chapter may sue

therefor in any appropriate United States district court . . . ").  Section 1962, as interpreted by the

Fifth Circuit Court of Appeals, provides in its simplest terms, that:

(a)   a person who has received income from a pattern of racketeering activity cannot invest that income in an enterprise;[3]

(b)   a person cannot acquire or maintain an interest in an enterprise through a pattern of racketeering activity;[4]

(c)   a person who is employed by or associated with an enterprise cannot conduct the affairs of the enterprise through a pattern of racketeering activity;[5] and

---

both injury and causation); *Khurana v. Innovative Health Care Systems, Inc.*, 130 F.3d 143, 147 (5th Cir. 1997)(standing to sue under RICO requires allegations and proof of "(1) a violation of § 1962, (2) an injury to business or property, *and* (3) that his injury was proximately caused by the RICO violation")(emphasis in original, *cert. granted and judgment vacated on other grounds sub nom. Teel v. Khurana*, 119 S. Ct. 442 (1998).  If the plaintiff's injury is not proximately caused by the RICO defendant's substantive violations of § 1962, the plaintiff has no standing to sue under RICO.  *Price*, 138 F.3d at 607.

[3] 18 U.S.C. § 1962(a) provides specifically, in pertinent part:

It shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity or through collection of an unlawful debt in which such person has participated as a principal within the meaning of section 2, Title 18, United States Code, to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.

[4] 18 U.S.C. § 1962(b) provides:

It shall be unlawful for any person through a pattern of racketeering activity or through collection of an unlawful debt to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.

[5] 18 U.S.C. § 1962(c) provides:

It shall be unlawful for any person employed by or associated with any enterprise

5

(d)    a person cannot conspire to violate subsections (a), (b), or (c).[6]

*Crowe v. Henry*, 43 F.3d 198, 203 (5th Cir. 1995).  All civil RICO claims require allegations and proof of "1) a *person* who engages in 2) a *pattern of racketeering activity* 3) [which is] connected to the acquisition, establishment, conduct or control of an *enterprise*." *Id.* at 204 (emphasis in original).

A "person", within the meaning of § 1962, "includes any individual or entity capable of holding a legal or beneficial interest in property." 18 U.S.C. § 1961(3).  To be liable as a "RICO person" under § 1962, however, the defendant must be "one that either poses or has posed a continuous threat of engaging in acts of racketeering." *Delta Truck & Tractor, Inc. v. J.I. Case Co.*, 855 F.2d 241, 242 (5th Cir. 1988), *cert. denied*, 109 S. Ct. 1531 (1989).

A "pattern of racketeering" within the meaning of § 1962 "requires at least two acts of racketeering activity." 18 U.S.C. § 1961(5).  In this circuit, "a pattern of racketeering activity" has two elements: "1) predicate acts--the requisite racketeering activity, and 2) a pattern of such acts." *In re Burzynski*, 989 F.2d 733, 742 (5th Cir. 1993).  Predicate acts are delineated in 18 U.S.C. § 1961(1), and include, for purposes of this case, extortion.  To set out a pattern of predicate acts, a plaintiff must demonstrate that the predicate acts are related and that such acts have some type of continuity.  *Id.*

---

engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of an unlawful debt.

[6] 18 U.S.C. § 1962(d) provides:

It shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section.

An "enterprise" within the meaning of § 1962 "includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). If the plaintiff is alleging an association-in-fact enterprise, there must be allegations and evidence demonstrating "'an ongoing organization, formal or informal, and . . . evidence that the various associates function as a continuing unit.'" *Whelan v. Winchester Prod. Co.*, 319 F.3d 225, 229 (5th Cir. 2003) (quoting *United States v. Turkette*, 101 S. Ct. 2524, 2528 (1981)). "The enterprise is not a pattern of racketeering activity, but must exist separate and apart from the pattern of racketeering activity in which it engages." *Id.* at 229.

Here, while Defendants argue, for a multitude of reasons, that Plaintiffs have not alleged plausible RICO claims, the plausibility of Plaintiffs' RICO claim is most directly and clearly affected by Plaintiffs' failure to allege a plausible "racketeering activity." Plaintiffs' RICO claims are subject to dismissal on that basis alone.[7]

In their Complaint, Plaintiffs allege that the RICO Defendants, through one or both of their association-in-fact enterprises, "have engineered a wide-ranging campaign to economically extort Plaintiffs, by repeatedly threatening Plaintiffs and/or the Cedra Owners with economic harm in order to coerce Cedra Houston, and ultimately Cedra Dallas and Cedra LA, into respectively foregoing their exercising of their right and opportunity, under Federal and state law, to service customers whose pharmacy benefits were administered by ORX in their respective geographical areas."

---

[7] Because Plaintiffs' allegations clearly do not support a plausible predicate claim for extortion under controlling Supreme Court precedent, *Scheidler v. Nat'l Org. for Women, Inc.*, 537 U.S. 393 (2003), Defendants' additional and alternative bases for dismissal of the Plaintiffs' RICO claims will not be addressed.

7

Complaint (Document No. 1) at ¶ 184  Plaintiffs also allege that the RICO Defendants subjected

Cedra Houston to "arbitrary, capricious and protracted audits," *Id.* at ¶ 185 and also "arranged for

the simultaneous audit of four new York pharmacies affiliated with Plaintiffs, in order to send a

thinly-veiled threat to Plaintiffs that their continued attempt to join ORX's network and expand their

operations would result in harm to the Cedra Owners, in the hope that the financial pressure placed

on the Cedra Owners would induce Cedra Houston, Cedra Dallas, and Cedra LA to withdraw their

network applications, and thus forego the opportunity to service customers in their respective areas

whose pharmacy benefits were administered by ORX". *Id.* at ¶ 191.  Plaintiffs allege that this

conduct constitutes extortion under the Hobbs Act, 18 U.S.C. § 1951(b)(2), and that extortion is a

form of racketeering under RICO.

Extortion under the Hobbs Act, which would serve as a predicate act of racketeering for

purposes of a civil RICO claim, 18 U.S.C. § 1961(1) (definition of "racketeering activity"), is

defined as "the obtaining of property from another, with his consent, induced by wrongful use of

actual or threatened force, violence, or fear, or under color of official right." 18 U.S.C. § 1851(b)(2).

Here, the *property* interest Plaintiffs claim to have lost is their "right and opportunity" to provide

pharmacy services to those covered by ORX's network.  But assuming that such a right or

opportunity exists, and exists as Plaintiffs' "property," extortion does not occur simply when a

plaintiff claims to have lost property by virtue of a defendant's wrongful conduct.  Instead, the

predicate act of extortion requires that the RICO Defendants *obtain*, or otherwise gain, Plaintiffs'

property. In *Scheidler v. Nat'l Org. for Women, Inc.*, 537 U.S. 393, 404 (2003), the Supreme Court

made it clear that the extortion provisions of the Hobbs Act "require not only the deprivation but also

the acquisition of property." *See also Block v. Snohomish Cty.*, 733 F. App'x 884, 888 (9th Cir.

2018) ("extortion as used in the RICO context requires showing that the defendant received something of value which can be 'exercised, transferred or sold.'" ). Here, taking Plaintiffs' allegations as true, Defendants did not obtain, or gain, anything of Plaintiffs – nor could they under the facts alleged. The United Defendants are health care companies. ORX is a pharmacy benefit manager. The specialty pharmacy defendants are specialty pharmacies in the ORX pharmacy network, who are affiliated with the United Defendants. None of these Defendants obtained, or sought to obtain, any tangible or intangible property, right or opportunity claimed by Plaintiffs in this case. Moreover, none of the Defendants was in any position to obtain any tangible or intangible property, right or opportunity claimed by Plaintiffs in this case. And, obtaining or seeking to obtain property is key to an extortion claim; conduct which merely interferes with or otherwise deprives someone of property is not sufficient to constitute Hobbs Act extortion. *United States v. McFall*, 558 F.3d 951, 956 (9th Cir. 2009) ("We have stated that Hobbs Act extortion is a 'larceny-type offense,' which 'does not occur when a victim is merely forced to part with property.' Instead, 'there must be an "obtaining": someone—either the extortioner or a third person—must receive the property of which the victim is deprived.'") (internal citation omitted); *see also Sekhar v. United States*, 570 U.S. 729, 734 (2013) ("the Hobbs Act defines its crime of 'extortion' as 'the *obtaining of property from another,* with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right.' Obtaining property requires 'not only the deprivation but also the acquisition of property.' That is, it requires that the victim 'part with' his property, and that the extortionist 'gain possession' of it. The property extorted must therefore be *transferable*—that is, capable of passing from one person to another.") (internal citations omitted).

Because Plaintiffs have not alleged that Defendants obtained, or attempted to obtain, their

property, Plaintiffs have not alleged a plausible predicate act for purposes of their § 1962(c) RICO claim, and that claim is subject to dismissal pursuant to Rule 12(b)(6). *See e.g., S. Snow Mfg. Co. v. SnoWizard Holdings, Inc.*, 912 F. Supp. 2d 404, 424 (E.D. La. 2012) (finding that Plaintiffs had not alleged viable predicate acts of extortion to support a civil RICO claim where the alleged extortion was based on "the transmission of cease and desist letters, the commencement of litigation on the basis of intellectual property rights, internet postings that '[SnoWizard] will protect [its] legal and trademark right,' and the refusal to provide services or retail products to Plum Street employees"), , *aff'd*, 567 F. App'x 945 (Fed. Cir. 2014), *cert. denied*, ___ U.S. ___, 135 S.Ct. 1416 (2015); *Mendez Internet Mgmt. Servs., Inc. v. Banco Santander de Puerto Rico, No.* CIV. 08-2140 (JAF), 2009 WL 1392189, at *4 (D.P.R. May 15, 2009) (dismissing plaintiff's civil RICO claim predicated on extortion where the supporting allegations were that defendants interfered with plaintiff's "license to establish a dinar sales outlet in Puerto Rico" but there were no allegations that defendants "actually acquired Méndez' license to distribute dinars in Puerto Rico"), *aff'd*, 621 F.3d 10 (1st Cir. 2010); *Walker v. Beaumont Indep. Sch. Dist.*, No. 1:15-CV-379, 2017 WL 928459, at *9 (E.D. Tex. Mar. 6, 2017) (where plaintiff alleged that "when he refused to join the union" he was "threatened that they 'would get him one way or another'" but there was "no indication that the IBEW took or sought to take property from Walker or that he was induced to give consent to the taking of such property" plaintiff had not stated a plausible attempted extortion claim), *report and recommendation adopted*, No. 1:15-CV-379, 2017 WL 1166779 (E.D. Tex. Mar. 28, 2017), *appeal filed*, No. 17-40752.  In addition, because Plaintiffs have not alleged a plausible § 1962(c) RICO claim, their RICO conspiracy claim under § 1962(d) is also not plausible, and is subject to dismissal as well. *N. Cypress Med. Ctr. Operating Co. v. Cigna Healthcare*, 781 F.3d 182, 203 (5th Cir. 2015)

("Since North Cypress failed to properly plead a claim under §§ 1962(a), (b), or (c), it correspondingly failed to properly plead a claim under § 1962(d)."); *Allstate Ins. Co. v. Benhamou*, 190 F. Supp. 3d 631, 663 (S.D. Tex. 2016) ("when a plaintiff fails properly to allege a violation of § 1962(c), his § 1962(d) claim is without basis").

### B.    Anti-Trust Claims - Claims 3, 4, and 5

Plaintiffs assert anti-trust claims under sections 1 and 2 of the Sherman Act, alleging that Defendants conspired to restrain trade in the specialty drug market, and monopolized and/or sought to monopolize the specialty drug market. Plaintiffs also assert a claim under section 7 of the Clayton Act, alleging that the merger between ORX and the Catamaran Defendants lessened competition and created a monopoly in the relevant market. Plaintiffs allege that:

> 216.    The relevant service market affected by Defendants['] conduct is the specialty pharmacy market that are reimbursed by insurance, including, but not limited to, the dispensing of prescriptions. The relevant product market affected by Defendants['] conduct are prescription drugs reimbursed by insurance, including, but not limited to, specialty drugs such as those used to treat Hepatitis C.

> 217.    The relevant geographic market is the United States, including, but not limited to, the State of Texas and the State of California.

> 218.    Defendants, by administering the drug benefits of 65 million Americans, control a significant portion of the relevant market.

> 219.    Defendants' conspiracy had the unlawful effect of restraining and eliminating competition in the provision of pharmacy services, in particular the dispensing of specialty drugs, in all markets which Plaintiffs and other independent pharmacies did and could operate in interstate commerce.

Complaint (Document No. 1).

Section 1 of the Sherman Act prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce". 15 U.S.C. § 1. The Supreme Court has construed section 1 to outlaw *unreasonable* restraints of trade. *Ohio v. Am. Express Co.*, ___ U.S. ___, 138 S. Ct. 2274, 2283 (2018) ( "This Court's precedents have thus understood § 1 'to outlaw only *unreasonable* restraints.'") (citing *State Oil Co. v. Khan,* 522 U.S. 3, 10 (1997)). To state a claim under section 1 of the Sherman Act, a plaintiff must allege "the defendants '(1) engaged in a conspiracy (2) that restrained trade (3) in a particular market.'" *MM Steel, L.P. v. JSW Steel (USA) Inc.*, 806 F.3d 835, 843 (5th Cir. 2015) (quoting *Spectators' Commc'n Network, Inc. v. Colonial Country Club*, 253 F.3d 215, 220 (5th Cir. 2001)), *cert. denied*, ___ U.S. ___, 137 S.Ct. 372 (2016). Section 2 of the Sherman Act prohibits the monopolization of, as well as the attempt to monopolize, trade or commerce. 15 U.S.C. § 2. To state a claim under section 2 of the Sherman Act, a plaintiff must either allege that the defendant "1) possesses monopoly power in the relevant market and 2) acquired or maintained that power willfully, as distinguished from the power having arisen and continued by growth produced by the development of a superior product, business acumen or historic accident," *Rio Grande Royalty Co. v. Energy Transfer Partners, L.P.*, 786 F. Supp. 2d 1190, 1196 (S.D. Tex. 2009), or "(1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power." *Retractable Techs., Inc. v. Becton Dickinson & Co.*, 842 F.3d 883, 891 (5th Cir. 2016), *cert. denied*, ___ U.S. ___, 137 S.Ct. 1349 (2017). Section 7 of the Clayton Act, 15 U.S.C. § 18, "forbids mergers in any line of commerce where the effect may be 'substantially to lessen competition or tend to create a monopoly.'" *SureShot Golf Ventures, Inc. v. Topgolf Int'l, Inc.*, No. CV H-17-127, 2017 WL 3658948, at *3 (S.D. Tex. Aug. 24, 2017), *aff'd as modified*, No. 17-20607,

12

2018 WL 4927554 (5th Cir. Oct. 9, 2018). To state a claim under § 7 of the Clayton Act, a plaintiff must allege, to establish a prima facie case, that the "transaction in question will significantly increase market concentration." *Chicago Bridge & Iron Co. N.V. v. F.T.C.*, 534 F.3d 410, 423 (5th Cir. 2008).

Here, Defendants argue that all of Plaintiffs' anti-trust clams are subject to dismissal because Plaintiffs have not alleged facts that would establish a "relevant market." Defendants then focus on Plaintiffs' § 1 claim, arguing that Plaintiffs have also not alleged any facts establishing an "agreement between any Defendants or anticompetitive effects flowing from any alleged restraint of trade." Motion at 28 (Document No. 16 at 40). As for Plaintiffs' § 2 claim, Defendants additionally argue that Plaintiffs' Complaint is devoid of factual allegations that could establish any monopoly power or a dangerous probability of achieving monopoly power, and have not alleged any conduct that is actionably anticompetitive. With respect to the § 7 claim, Defendants maintain that Plaintiffs have not alleged any facts about any merger that lessened competition and created a monopoly. Plaintiffs have responded to the arguments about their § 1 and § 2 claims, but have not responded, at all, to Defendants' arguments for dismissal of the § 7 claim. That failure to respond, or address the arguments for dismissal of the § 7 claim, constitutes a waiver or abandonment of the § 7 claim, *see Black v. N. Panola Sch. Dist.*, 461 F.3d 584, 588 n.1 (5th Cir. 2006) ("failure to pursue [a] claim beyond her complaint constituted abandonment"), and the § 7 claim will be dismissed on the grounds, and for the reasons set forth, in Defendants' Motion to Dismiss. That leaves Plaintiffs' § 1 and § 2 claims, with the major disagreements among the parties at this pleading stage being whether Plaintiffs have alleged a relevant market, whether Plaintiffs have alleged an "agreement" or conspiracy between the Defendants in restraint of trade, and whether Plaintiffs have, or can allege,

monopoly power and/or any attempt to gain monopoly power.

Defendants make a strong argument for dismissal of the anti-trust claims based on Plaintiffs' failure to allege facts that would establish a "relevant market."[8] But, Defendants' claim specific arguments are even stronger, meaning that Plaintiffs have not alleged an agreement that could suffice to state a claim under § 1 of the Sherman Act, and have not alleged, as a matter of law, that Defendants have attained, or seek to attain, monopoly power. The focus herein will therefore be on those arguments because they are pleading defects that cannot, for the reasons set forth below, be

---

[8] Plausible allegations of a "relevant market" are needed to state a claim under § 1 or § 2 of the Sherman Act. *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 459 (1993) (§ 2 claim); *PSKS, Inc. v. Leegin Creative Leather Prod., Inc.*, 615 F.3d 412, 417 (5th Cir. 2010) (§ 1 claim), cert. denied, 562 U.S. 1217 (2011). A relevant market consists of both a product market and a geographic market. *Apani Sw., Inc. v. Coca-Cola Enterprises, Inc.*, 300 F.3d 620, 626 (5th Cir. 2002) (a plaintiff must "first identify the relevant product and geographic markets"). Although Defendants argue that Plaintiffs have failed to allege any definable "product" much less a "product market," and have likewise failed to allege a definable geographic market, Plaintiffs respond to the Motion to Dismiss by arguing that the product market alleged is "the market for specialty pharmacy services for patients whose prescription drug benefits are administered by ORX," and that the relevant geographic market is the "geographical area surrounding each of the Plaintiffs' pharmacies." Response at 29, 31 (Document No. 22 at 40, 42). This response has "muddied the waters" as to what Plaintiffs have, or could allege, as the relevant market in this case. Defendants appear to acknowledge that in their Reply. *See* Reply (Document No. 24) at 19 ("The market allegations are even less clear after Plaintiffs' Response."). Because the "relevant market" analysis is not now as clear and straight-forward as posited by Defendants in their Motion to Dismiss, and because it may be that Plaintiffs could amend their Complaint and their "relevant market" allegations, Defendants' "relevant market" argument for dismissal is not the argument that will be considered herein in determining that Plaintiffs have failed to state a plausible anti-trust claim under either § 1 or § 2 of the Sherman Act. *See E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 443 (4th Cir. 2011) (commenting on how dismissing an anti-trust claim for failure to allege a relevant market can be "problematic"); *see also e.g., Construction Cost Data, LLC v. Gordian Group, Inc.*, Civil Action No. H-16-114, 2017 WL 2266993 (S.D. Tex. Apr. 24, 2017) (rejecting argument that plaintiff had not alleged a relevant product market), *recommendation adopted*, 2017 WL 2271491 (S.D. Tex. May 22, 2017); *Universal Hosp. Serv., Inc. v. Hill-Rom Holdings, Inc.*, Civil Action No. SA-15-CA-32-FB, 2015 WL 6994438 (W.D. Tex. Oct. 15, 2015) (rejecting argument that plaintiffs had failed to allege a relevant geographic market).

remedied through a pleading amendment.

### 1.    § 1 Claim

In *Twombly*, which is cited most often as establishing the standard for assessing the plausibility of claims under FED. R. CIV. P. 12(b)(6), the Supreme Court addressed the allegations that it determined were insufficient to state a claim under § 1 of the Sherman Act.  The Supreme Court started from the premise that "[b]ecause § 1 of the Sherman Act 'does not prohibit [all] unreasonable restraints of trade . . . but only restraints effected by a contract, combination, or conspiracy,' '[t]he crucial question is whether the challenged anticompetitive conduct 'stems from independent decision or from an agreement, tacit or express.'" *Twombly*, 550 U.S. at 553 (internal citations omitted)  The Supreme Court then determined that stating a claim under § 1 "requires a complaint with enough factual matter (taken as true) to suggest that an agreement was made," for "without [a] further circumstance pointing toward a meeting of the minds, an account of a defendant's commercial efforts stays in neutral territory." *Id.* at 556-57.

Here, Plaintiffs allege that several mergers, as between ORX and the Catamaran Defendants, and as between the Catamaran Defendants and Defendant Salveo Specialty Pharmacy, constitute the "agreements" between the parties that are required for their § 1 Sherman Act claim.   While some factual context is provided for the mergers themselves, there are no factual allegations (as opposed to conclusory allegations) that could, when taken as true, establish the existence of a pre-merger agreement or conspiracy between Defendants to restrain trade.   According to Plaintiffs in their Complaint:

> 9.    Previously, the Catamaran Defendants and ORX were separate PBMs.  In 2015, Defendant UnitedHealth Group, the parent company of ORX, acquired Catamaran, united the two companies, and created the third-largest PBM in the

United States – Catamaran/OptumRx. Patients whose claims must be processed by the Defendants typically comprise about thirty to forty percent of a retail pharmacy's business.

* * *

14.     Even pre-merger, the Defendant PBMs owned large in-house mail-order specialty pharmacies, such as Defendant Briova, and were rapidly expanding their presence in the specialty market.   For instance, in 2015 Catamaran acquired Defendant Salveo, one of the largest specialty pharmacies.  This helped Catamaran to increase their revenues in the first quarter of 2015 by over twenty percent compared to the same period in 2014.  Defendants have repeatedly stated that one, if not *the* primary, reason for the combination of Catamaran and ORX was to capture a larger share of the specialty drug market.

* * *

79.     Prior to the completion of the ORX/Catamaran merger, Defendants UnitedHealth Group, ORX, Catamaran, Briova and (prior to their acquisition by Catamaran) Salveo would meet regularly to discuss potential business "synergies." Upon information and belief, as part of these "synergy" discussions, Defendants conspired to act in concert to eliminate competition by independent pharmacies from the specialty drug market, through any means possible - whether or not lawful.

80.     In January of 2014, Defendants UnitedHealth Group, ORX and Catamaran began meeting in earnest, and on a regular basis, to discuss the possibility of merging; while these discussions were ongoing, Defendant Salveo and Defendants Catamaran/Briova would begin discussing a merger as well.

81.     Upon information and belief, these merger discussions were part of a larger conspiracy to restrain and destroy competition for specialty drugs, allowing Defendants to capture additional volume in an incredibly lucrative source of revenue.

82.     Defendants have frequently and publicly made clear the importance of their specialty pharmacy business in relation to the unlawful merger of Catamaran and ORX. In the press release announcing the merger, Defendants specifically cited the "rapidly growing specialty pharmacy services" that both Defendants ORX and Catamaran offered as a prime reason for the merger.

83.     On another occasion, when announcing the deal to Catamaran employees, Defendants' executives stated that "both of our companies have strong specialty pharmacy business. Specialty pharmacy is expected to grow by 300 percent over the next five years, from $100 billion in revenues to potentially $400 billion annually by

2020."

84.     Moreover, during the Catamaran/ORX merger discussions,. Catamaran, Briova and Salveo held discussions about merging their businesses. In November of 2014, Defendant Catamaran announced their intent to acquire Defendant Salveo. The transaction closed in February 2015. When announcing the acquisition, Mark Thierer, then-Chairman and CEO of Catamaran, stated that "Salveo and BriovaRx are highly complementary to each other and the combination presents a great opportunity to further expand our specialty scale."

85.     Upon information and belief, Catamaran's acquisition of Salveo was also motivated by a desire to increase its market share, and then use that market share to eliminate competition upon merging with ORX.

86.     Defendants engaged in other transactions aimed at growing their specialty pharmacy business. Texas, New York and California, as the three largest markets for filling prescription drugs, were particularly important targets for market domination in the lead-up to the Catamaran/ORX merger.

87.     As of March 2014, Catamaran operated retail mail pharmacy facilities in three states – one of which was Texas. It also maintained specialty pharmacy operations in Texas. In or about October 2011, Catamaran acquired tPTRX, Inc. ("PTRX"), a full-service PBM, and its exclusive mail-order pharmacy provider, SaveDirectRx, Inc., both based in San Antonio, Texas, for the stated purpose of allowing Catamaran to "extend its presence in the southwestern part of the U.S."

88.     The purchase of Salveo was also a significant move by Catamaran into the New York and California markets. Indeed, according to Catamaran's executives, the motivation behind the purchase was Salveo "providing a local market presence on the East and West Coast", as well as Salveo's "core focus" on Hepatitis C drugs.

89.     Additionally, upon information and belief, Defendants planned to grow Salveo's already-significant Hepatitis C business by eliminating any independent pharmacy competition.

90.     The Defendants' securities filings also emphasize the importance of the specialty pharmacy business and the enormous revenue it generated. In a 10Q filed with the Securities and Exchange Commission, Catamaran noted that by March 31, 2015, revenue increased by $1.1 billion, or 21.7%, to $6.0 billion for the three months ending March 31, 2015, as compared to $4.9 billion for the three months ending March 31, 2014. Catamaran cited the prime reasons for this growth as being the "expansion of our specialty book of business, as well as the addition of the Salveo specialty business." Additionally, Defendants noted that their increased specialty

claim volume – as opposed to regular prescription claims – increases their overall revenue per prescription claim due to specialty claims carrying a higher revenue per prescription claim rate.

91.      Upon information and belief, Defendants had decided that a merger first combining their specialty pharmacy operations, and then a merger combining their PBM operations and rendering themselves indispensable to independent pharmacies, would be the best method for serving the goal of eliminating independent pharmacy competition in the specialty drug market.  As such, all mergers, including the Catamaran/ORX merger which was completed in 2015, were an unlawful conspiracy to restrain and destroy competition.

Complaint (Document No. 1).  These factual allegations, when taken as true, do not support the

existence of a conspiracy or agreement between the pre-merger Defendants to restrain trade in the

manner alleged by Plaintiffs in this case.

First, as directed by *Iqbal*, and suggested by *Twombly*, conclusory allegations about the

existence of a conspiracy are given no consideration.  Instead, it is only the factual allegations that

have any bearing in a Rule 12(b)(6) context, and here, the factual allegations in Plaintiffs' Complaint

can only be distilled to the following: (1) in February 2015, the Catamaran Defendants acquired

Defendant Salveo; (2) in July 2015, the Catamaran Defendants were acquired by the United

Defendants and merged with ORX, creating the third largest PBM, with 22-23% of the national

prescription claims market; (3) prior to those mergers there were pre-merger meetings and

discussions between the Defendants, including discussions about business "synergies"; (4) the

specialty pharmacy market is lucrative; and (5) the mergers yielded greater market share for the post-

merger companies.  These factual allegations do not support the existence of an agreement or

conspiracy between the Defendants to restrain trade.  And, more importantly, these factual

allegations do not support the existence of an agreement or conspiracy between Defendants to

restrain trade in a way that affected Plaintiffs.  What that means is that even if the allegations were

18

more factually specific and particularized about Defendants' merger efforts being the "agreement" or "conspiracy" to restrain trade, that is not what Plaintiffs are complaining about in this case. In this case Plaintiffs are complaining about being denied or refused admission into ORX's pharmacy network. Nothing in Plaintiffs' allegations bridges the gap between the type of agreement/conspiracy Plaintiffs have tried to allege in support of their claim under § 1 of the Sherman Act, and the restraint on trade Plaintiffs claim to have been affected by.

Second, even if the existence of the mergers, along with the alleged pre-merger meetings and discussions about business "synergies" had any relation to Plaintiffs' claims in this case, the allegations surrounding those mergers are akin to the "parallel" conduct allegations the Supreme Court in *Twombly* found insufficient. In *Twombly*, the allegations of an agreement or conspiracy were based on the defendants' parallel business conduct which had the effect of inhibiting the growth of competitors in each defendant's respective service area. That parallel conduct consisted of making unfair network access agreements, providing inferior network connections, overcharging, and "billing in ways designed to sabotage [the plaintiffs'] relations with their own customers," all of which was alleged to have been done to further the defendants' common motivation to thwart competition. *Twombly*, 550 U.S. at 550-51. In determining that these allegations of parallel conduct were insufficient, the Supreme Court explained:

> The need at the pleading stage for allegations plausibly suggesting (not merely consistent with) agreement reflects the threshold requirement of Rule 8(a)(2) that the "plain statement" possess enough heft to "sho[w] that the pleader is entitled to relief. A statement of parallel conduct, even conduct consciously undertaken, needs some setting suggesting the agreement necessary to make out a § 1 claim; without further circumstance pointing toward a meeting of the minds, an account of a defendant's commercial efforts stays in neutral territory. An allegation of parallel conduct is thus much like a naked assertion of conspiracy in a § 1 complaint; it gets the complaint close to stating a claim, but without some further enhancement it stops short of the

line between possibility and plausibility of "entitle[ment] to relief."

*Id.* at 557. Here, the mergers about which Plaintiffs complain occurred first as between the Catamaran Defendants and Defendant Salveo, and thereafter as between the Catamaran Defendants and the United Defendants and ORX. The existence of the mergers and the timing of them are the same kind of commercial efforts that "stay[] in neutral territory." As for Plaintiffs' allegations that Defendants had pre-merger meetings and pre-merger discussions about business "synergies," the existence of such meetings and discussions are part and parcel of every merger, for there could never be a merger without pre-merger meetings and discussions. Here, the merger allegations, like the parallel conduct allegations in *Twombly*, are not enough to plausibly suggest an agreement or conspiracy between Defendants to restrain trade. Plaintiffs' § 1 claim is therefore subject to dismissal for failure to state a plausible agreement or conspiracy between the Defendants to restrain trade, and restrain trade in the manner about which Plaintiffs complaint in this case.

Inasmuch as dismissal of Plaintiffs' § 1 claim is warranted on the allegations in Plaintiffs' Complaint, there is nothing in Plaintiffs' Complaint or their arguments in response to Defendants' Motion to Dismiss to indicate or suggest that Plaintiffs could amend their Complaint to allege facts to state a plausible agreement or conspiracy between Defendants. Plaintiffs' allegations about an agreement or conspiracy between Defendants is *solely* based on Defendants' mergers and their pre-merger meetings and discussions. As set forth above, those allegations are insufficient and there is nothing in the record that would lead the undersigned to believe that additional allegations could be included to get Plaintiffs' over the "line from conceivable to plausible." *Twombly*, 550 U.S. at 570. Moreover, any additional allegations about Defendants' post-merger conduct could not support the existence of a § 1 conspiracy or agreement because Defendant UnitedHealth Group, Inc. directly or

20

indirectly owns all of the other Defendants, and a parent company cannot, as a matter of law, conspire with its wholly owned subsidiaries. *Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752 (1984). Here, both Plaintiffs and Defendants agree on the corporate structure of Defendants, with Plaintiffs alleging in their Complaint that Defendants United Healthcare Services, Inc. and ORX are wholly owned subsidiaries of Defendant UnitedHealth Group, and that Defendant specialty pharmacies merged with Defendant ORX, which, again, is a wholly owned subsidiary of Defendant UnitedHealth Group. Given that Defendant United Health Group wholly owns the other Defendants, there is no reason to believe that Plaintiffs could amend their Complaint to include any allegations of any post-merger conduct that could state a plausible § 1 agreement or conspiracy. Plaintiffs' claim under § 1 of the Sherman Act should therefore be dismissed without leave to amend.

### 2.    § 2 Claim

A claim of monopoly power under § 2 of the Sherman Act requires allegations that a defendant "holds a predominant share of the relevant market." *In re: Pool Prods. Distrib. Mkt. Antitrust Litig.*, 940 F.Supp.2d 367, 382 (E.D. La. 2013). Market share of less than 50% is generally not considered a "prominent" share. *See id.* (collecting cases). In addition, a market share of less than 25% generally cannot provide a basis for a monopoly power claim under § 2 as a matter of law. *Domed Stadium Hotel, Inc. v. Holiday Inns, Inc.*, 732 F.2d 480, 490 (5th Cir. 1984) ("Recent cases by this court hold that market shares of between seventeen and twenty-five percent are legally insufficient to uphold a finding of monopolization, at least absent other compelling evidence that the defendant had monopoly power."). As for a claim of attempted monopolization, there must be factual allegations to support a conclusion that there is a dangerous probability of defendants' achieving monopoly power. Again, monopoly power does not exist unless the defendant's market

21

share is generally 50% or more.

> Here, in support of their § 2 claim, Plaintiffs allege, in formulaic manner, that Defendants:
>
> 241.   . . . monopolized and attempted with specific intent to monopolize the relevant market, and there is a substantial probable threat that Defendants' conduct will result in an actual monopolization of the relevant market in the future.
>
> 242.   In doing so, Defendants knowingly and intentionally, and with specific intent to do so, used their power as an indispensable PBM to foreclose or attempt to foreclose community pharmacy competition and divert to themselves more specialty pharmacy businesses.
>
> 243.   Defendants' monopolization and attempted monopolization have an overwhelmingly anti-competitive effect on the relevant market, with no added benefit to consumers.  In fact, as described hereinabove, consumers will suffer as a result of this monopolization and attempted monopolization.

Complaint (Document No. 1).  It is not these conclusory allegations that render Plaintiffs' § 2 claim implausible.  Instead, it is Plaintiffs' background allegations that the "Catamaran/ORX operation controls and processes over one billion prescription claims for approximately 65 million Americans, accounting for 22% of all prescription claims nationwide," Complaint at ¶ 42, which render Plaintiffs' § 2 claim implausible.  With 22% of the national prescription claims market – the only market identified or quantified by Plaintiffs – Defendants cannot, as a matter of law, be viewed as exercising monopoly power.  Similarly, given that alleged 22% market share, there are no allegations of a plausible claim of attempted monopolization.

With allegations that refute the existence of monopoly power and undercut any claim that there is a dangerous probability of Defendants' achieving monopoly power, Plaintiffs have not stated a plausible claim under § 2 of the Sherman Act, and that claim is subject to dismissal as well.  And, again, nothing in the record indicates that Plaintiffs could allege any facts to cure  these pleading deficiencies, and, consequently, Plaintiffs' claim under § 2 of the Sherman Act should also be

dismissed without leave to amend.

### C.    Unfair Competition Claim under Texas law – Claim 6

Plaintiffs allege in their Complaint, in support of their unfair competition claim under Texas

law, that "Defendants engaged in unfair methods of competition, unconscionable acts or practices,

and unfair and deceptive acts or practices, including deceptive audit practices, economic extortion,

and creating significant obstacles to Plaintiffs' entry into the ORX network." Complaint (Document

No. 1) at ¶ 254. Defendants seek dismissal of this unfair competition claim on the basis that no such

claim exists under Texas law. Citing to Judge Lakes's opinion in *Baisden v. I'm Ready Prods., Inc.*,

Civil Action No. H-08-0451, 2008 WL 2118170 at *8 (S.D. Tex. May 16, 2008), Defendants argue

that "'Texas law does not  recognize a tort of unfair competition.'"

In *Taylor Pub. Co. v. Jostens, Inc.*, 216 F.3d 465, 486 (5th Cir. 2000), the Fifth Circuit

explained the viability of unfair competition claims under Texas law as follows:

> Unfair competition under Texas law "is the umbrella for all statutory and
> nonstatutory causes of action arising out of business conduct which is contrary to
> honest practice in industrial or commercial matters." *American Heritage Life Ins. Co.
> v. Heritage Life Ins. Co.*, 494 F.2d 3, 14 (5th Cir.1974), *quoted in United States
> Sporting Prods., Inc. v. Johnny Stewart Game Calls, Inc.*, 865 S.W.2d 214, 217
> (Tex.App.—Waco 1993, writ denied). The tort requires that the plaintiff show an
> illegal act by the defendant which interfered with the plaintiff's ability to conduct its
> business. *See Schoellkopf v. Pledger*, 778 S.W.2d at 897, 904–05 (Tex.App.—Dallas
> 1989, writ denied). Although the illegal act need not necessarily violate criminal law,
> it must at least be an independent tort. *See id.* ("Without some finding of an
> independent substantive tort or other illegal conduct, we hold that liability cannot be
> premised on the tort of 'unfair competition.' "); 70 Tex. Jur.3d *Trademarks* § 33
> (1999) (same).

That means, as Defendants have argued, that while Texas does recognize a claim for unfair

competition, it must be based on some type of "wrongful" conduct, which has not been alleged by

Plaintiffs in this case.

Here, while Plaintiffs have alleged RICO claims and anti-trust claims, those claims are not, for the reasons set forth above, plausible. In the absence of those claims, there is no wrongful conduct upon which to base Plaintiff's claim of unfair competition under Texas law. As found by the Court in *Baisden*, Plaintiffs have not alleged a plausible unfair competition claim and that claim should be dismissed for failure to state a claim. *See e.g. Godfrey v. Wells Fargo & Co.*, No. 5:16CV79-RWS-CMC, 2017 WL 872679, at *6 (E.D. Tex. Jan. 9, 2017), *report and recommendation adopted*, No. 5:16-CV-00079-RWS, 2017 WL 841152 (E.D. Tex. Mar. 3, 2017) (dismissing as not plausible plaintiff's unfair competition claim, which was not based on allegations of an illegal act); *Wickfire, LLC v. Trimax Media, Inc.*, No. A-14-CA-34-SS, 2016 WL 4119917, at *8 (W.D. Tex. Mar. 25, 2016) (rejecting plaintiff's argument that an unfair competition claim under Texas law could be based on allegations of defamation, business disparagement, tortious interference with prospective business relations, and tortious interference with existing contracts).

**D.     Tortious Interference Claim under Texas Law – Claim 7**

Plaintiffs allege in their Complaint that "Defendants"[9] interfered with the business relationship Plaintiff Cedra Houston had with the pharmacy customers of the Houston pharmacy Cedra Houston acquired in June 2015, when Defendants denied Cedra Houston admission into ORX's pharmacy network. According to Plaintiffs:

> 258.     Cedra Houston, when purchasing the assets of Uptown Pharmacy, an ORX-enrolled pharmacy, including Uptown Pharmacy's goodwill, had a reasonable and valid expectation that it would be able to continue serving ORX members previously served by Uptown Pharmacy, since, in the ordinary course of business, a significant

---

[9] Although Plaintiffs allege that "Defendants," seemingly collectively, interfered with Cedra Houston's relationship with the customers it acquired when it purchased a Houston pharmacy, it was only ORX that denied Cedra Houston admission into ORX's pharmacy network. There are no allegations that any other Defendant was involved in that decision.

portion of a pharmacy's customers will continue patronizing a pharmacy following a sale of the business.

259.    Defendants were aware the interference was certain or substantially certain to occur as a result of their refusal to grant Cedra Houston entry into the ORX network.

260.    Defendants knew that under Federal and Texas law, Plaintiffs had the right to participate in the ORX network, and Defendants had a lawful obligation to grant Plaintiffs entry into the ORX network.

261.    Through the wrongful conduct described above, Defendants acted intentionally or with a conscious desire to prevent the relationships from occurring or knew the interference was certain or substantially certain to occur as a result of Defendants' conduct.

262.    Defendants' conduct is without justification or excuse and constitutes unlawful, tortious, wrongful, unfair, and intentional malicious interference with Plaintiffs' advantageous prospective business relationships, and Plaintiffs have been actually damaged as a result.

Complaint (Document No. 1).  Defendants seek dismissal of this tortious interference claim  on the

basis that Plaintiffs have not alleged any conduct on the part of Defendants that is plausibly tortious.

The elements of a claim for tortious interference with a prospective business relationship are:

"(1) there was a reasonable probability that the plaintiff would have entered into a business

relationship with a third party; (2) the defendant either acted with a conscious desire to prevent the

relationship from occurring or knew the interference was certain or substantially certain to occur as

a result of the conduct; (3) the defendant's conduct was independently tortious or unlawful; (4) the

interference proximately caused the plaintiff injury; and (5) the plaintiff suffered actual damage or

loss as a result." *Coinmach Corp. v. Aspenwood Apartment Corp.*, 417 S.W.3d 909, 923 (Tex. 2013);

*see also Wal–Mart Stores, Inc. v. Sturges,* 52 S.W.3d 711, 713 (Tex. 2001) ("to establish liability

for interference with a prospective contractual or business relation the plaintiff must prove that it was

harmed by the defendant's conduct that was either independently tortious or unlawful"). Here, at

the pleading stage, Defendants challenge Plaintiff's tortious interference claim at element three,

arguing that ORX's denial of Cedra Houston's application to participate in ORX's pharmacy

network has not plausibly been alleged to have been unlawful or tortious under state law. Plaintiffs,

in response, argue that Defendants' conduct was unlawful and/or tortious inasmuch as it constitutes

unfair competition.

"[A] claim of tortious interference with prospective business relations requires proof of a

violation of state law, rather than federal law." *PPD Enters., LLC v. Stryker Corp.*, Civil Action No.

4:16-CV-0507, 2017 WL 4950064 at *3-4 (S.D. Tex. Nov. 1, 2017). That means, for purposes of

this case, that the third element of Plaintiffs' tortious interference claim cannot be premised on

Plaintiffs' RICO claims or its federal anti-trust claims. That leaves, for alleged state law violations,

only Plaintiffs' reference to Texas' any-willing-provider statute, TEX. INS. CODE § 21.52B[10], and

Plaintiffs' circular reliance on their aforementioned unfair competition claim. Neither state law

theory provides a basis for a plausible tortious interference claim. First, as argued by Defendants,

---

[10] Article 21.52B of the Texas Insurance Code provides in pertinent part:

A health insurance policy or managed care plan that is delivered, issued for
delivery, or renewed or for which a contract or other agreement is executed may
not:

* * *

(2) deny a pharmacy or pharmacist the right to participate as a contract provider
under the policy or plan if the pharmacy or pharmacist agrees to provide
pharmaceutical services that meet all terms and requirements and to include the
same administrative, financial, and professional conditions that apply to
pharmacies and pharmacists who have been designated as providers under the
policy or plan . . .

under current Fifth Circuit precedent, Texas' any-willing-provider statute is entirely preempted by 29 U.S.C. Ch. 18, ERISA. *Tex. Pharmacy Ass'n v. The Prudential Ins. Co. of Am.*, 105 F.3d 1035 (5th Cir. 1997). Second, Plaintiffs have not alleged a plausible unfair competition claim under Texas law, and cannot boostrap such an implausible unfair competition claim into the tortious conduct element of a tortious interference claim. *See e.g. Wickfire*, 2016 WL 4119917, at *8 (rejecting plaintiff's argument that an unfair competition claim could be based on allegations of tortious interference). Here, there are, quite simply, no plausible allegations of any state law violation that could support Plaintiff's tortious interference claim. That tortious interference claim is, consequently, not plausible, and is subject to dismissal on that basis.

### E.  Fair Procedure Claim under California Law – Claim 8

In their final claim, which relates only to Cedra LA, Plaintiffs allege that Defendants' "ongoing refusal to approve Cedra LA's admission into the ORX network, or to consider Cedra LA's application, or to provide a fair enrollment process," constitutes a denial of "fair process" under California common law. Defendants seek dismissal of this claim on the basis that Plaintiffs have not alleged facts that would implicate California's fair process doctrine and that such a claim, if Plaintiffs have standing to pursue it, is not ripe.

According to the Ninth Circuit, the "California common-law duty to provide fair procedures applies when (1) a significant public interest is affected, and (2) the private company is a 'gatekeeper,' in that it possesses substantial power such that its conduct 'significantly impairs the ability of an ordinary, competent' worker to practice the trade 'in a particular geographic area, thereby affecting an important, substantial economic interest.'" *Capitol W. Appraisals LLC v. Countrywide Fin. Corp.*, 467 F. App'x 738, 739–40 (9th Cir. 2012).; *see also Sound Appraisal v.*

*Wells Fargo Bank N.A.*, 451 F. App'x 648, 650 (9th Cir. 2011) ("To state a claim for violation of the California common law duty of fair procedure, [plaintiffs] must allege facts that, if true, would demonstrate that [defendants] 'wield[ ] power so substantial as to significantly impair [their] ability to practice ... in a particular geographic area.'").

Taking the factual allegations in Plaintiffs' Complaint as true, the Magistrate Judge concludes that Plaintiffs have not stated a California fair procedure claim for two reasons. First, there are no factual allegations (as opposed to conclusory allegations which must be disregarded) that implicate a significant *public* interest. While Plaintiffs allege that there are "a significant number of ORX members residing in California, and as such the refusal to admit a pharmacy into the ORX network thus impacts the public interest," these are conclusory allegations and there are no facts to support them. Moreover, this is the only allegation of a "public" interest that is at stake; all Plaintiffs' other allegations revolve around its own "economic" interests. Second, other than alleging that Defendants have either not approved Cedra LA's application or have refused to consider it, Plaintiffs have not alleged how the process is unfair or how Defendants have influence or control as a *"gatekeeper"* in California such that their power significantly impairs Cedra LA's ability to do business. As set forth above, Plaintiffs allege that ORX has 22% of the national prescription claims market. That market share is inconsistent with Plaintiffs' conclusory allegations that "Defendants' ongoing refusal to approve Cedra LA's admission into the ORX network, or to consider Cedra LA's application, or to provide a fair enrollment process, significantly impairs the ability of Cedra LA to operate a pharmacy in California." Because there are no factual allegations in Plaintiffs' Complaint to support a plausible fair process claim under California law, that claim is also subject to dismissal under FED. R. CIV. P. 12(b)(6) for failure to state a claim.

## IV.    Conclusion and Recommendation

Based on the foregoing, and the conclusion that Plaintiffs have not stated plausible RICO claims, plausible anti-trust claims, or plausible state law claims, the Magistrate Judge RECOMMENDS that Defendants' Motion to Dismiss (Document No. 16) be GRANTED.

The Clerk shall file this instrument and provide a copy to all counsel and unrepresented parties of record. Within fourteen (14) days after being served with a copy, any party may file written objections pursuant to 28 U.S.C. § 636(b)(1)(C), FED. R. CIV. P. 72(b), and General Order 80-5, S.D. Texas. Failure to file objections within such period shall bar an aggrieved party from attacking factual findings on appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Ware v. King*, 694 F.2d 89 (5th Cir. 1982), *cert. denied*, 461 U.S. 930 (1983); *Nettles v. Wainwright*, 677 F.2d 404 (5th Cir. 1982) (en banc). Moreover, absent plain error, failure to file objections within the fourteen day period bars an aggrieved party from attacking conclusions of law on appeal. *Douglass v. United Services Automobile Association,* 79 F.3d 1415, 1429 (5th Cir. 1996). The original of any written objections shall be filed with the United States District Clerk.

Signed at Houston, Texas, this ___7TH___ day of March, 2019.

FRANCES H. STACY
UNITED STATES MAGISTRATE JUDGE